593 A.2d 733

PATRICIA RUBANICK, EXECUTRIX OF THE ESTATE OF RON-
ALD G. RUBANICK, AND PATRICIA RUBANICK, INDIVIDU-
ALLY AND AS GUARDIAN AD LITEM FOR DAMIEN RUBAN-
ICK & RONALD G. RUBANICK, INFANTS, PLAINTIFF–RE-
SPONDENT, v. WITCO CHEMICAL CORP., (FOR DISCOVERY),
WITCO CHEMICAL CORP., ABC CORP., (A FICTITIOUS COR-
PORATION); DEF CORP., (A FICTITIOUS CORPORATION);
ALAN DOE, (IDENTITY UNKNOWN); CARL DOE, (IDENTITY
UNKNOWN), DEFENDANTS, AND MONSANTO COMPANY,
(FORMERLY MONSANTO CHEMICAL CORP.), DEFENDANT–
APPELLANT.

OMBRA DEMAIO, EXECUTRIX OF THE ESTATE OF ANTHONY
DEMAIO, AND OMBRA DEMAIO, INDIVIDUALLY, PLAIN-
TIFF–RESPONDENT, v. WITCO CHEMICAL CORP., (FOR DIS-
COVERY), WITCO CHEMICAL CORP., ABC CORP., (A FICTI-
TIOUS CORPORATION); DEF CORP., (A FICTITIOUS CORPO-
RATION), ALAN DOE, (IDENTITY UNKNOWN), CARL DOE,
(IDENTITY UNKNOWN), DEFENDANTS, AND MONSANTO
COMPANY (FORMERLY MONSANTO CHEMICAL CORP.), DE-
FENDANT–APPELLANT.

Argued March 12, 1991—Decided August 1, 1991.

422

*Clyde A. Szuch* argued the cause for appellant (*Pitney, Hardin, Kipp & Szuch,* attorneys, *Clyde A. Szuch, Elizabeth J. Sher,* and *Mary Anne Broderick,* on the briefs).

*Alfred F. Russo* argued the cause for respondents (*Russo & Casey,* attorneys, *Timothy M. Casey,* on the brief).

*Eugene M. Haring* and *Kenneth S. Geller,* a member of the District of Columbia bar, submitted a brief on behalf of *amici curiae* The Business Roundtable, The Chamber of Commerce of the United States, The Chemical Manufacturers Association, The National Association of Manufacturers, and The Product Liability Advisory Council, Inc. (*McCarter & English,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

In this case, the Court must determine the standard governing the admissibility of expert evidence relating to the causation of cancer in toxic-tort litigation. The survivors of two men who had worked at a chemical plant where they had been exposed to a toxic substance, polychlorinated biphenyls (PCBs), claim that their decedents' fatal colon cancer was caused by that exposure. The Law Division conducted a hearing to determine whether plaintiffs' expert testimony that PCBs had caused the fatal colon cancer of the victims was admissible.

Applying the conventional rule for determining the admissibility of such testimony, the court found that the expert's theory of causation was not sufficiently reliable because it had not been "accepted by at least a substantial minority of the applicable scientific community," and granted summary judgment for defendants. See 225 *N.J.Super.* 485, 542 *A.*2d 975 (1988).

A divided panel of the Appellate Division reversed the trial court. It determined that the conventional "general acceptance" test of reliability for theories of causation that are novel and controversial is inadequate in toxic-tort cases. It concluded that a different test of testimonial reliability, one focusing on the soundness of the foundation for the novel scientific theory of causation, is required in toxic-tort litigation. Finding plaintiffs' expert testimony admissible under that standard, it remanded the case to trial. See 242 *N.J.Super.* 36, 576 *A.*2d 4 (1990).

I

Ronald G. Rubanick worked for the Witco Chemical Corporation (Witco) at its plant in Perth Amboy from 1974 through 1979. In 1979 he was diagnosed as suffering from colon cancer. He died of the cancer on July 23, 1980, at the age of twenty-nine. About three-and-one half years after Rubanick's death, Anthony DeMaio, a thirty-year Witco employee, was also diagnosed as suffering from colon cancer. He died of the disease on June 29, 1984, at the age of fifty-two.

Plaintiffs, survivors of Rubanick and DeMaio, brought separate actions, which were heard together in the Appellate Division. Each complaint alleged that the individual decedent's exposure to PCBs caused the decedent's colon cancer and ultimate death. Defendant Monsanto Company (Monsanto) had sold Witco PCB fluids, under the trade-name Therminal, beginning in 1969 and continuing until some time prior to 1976.

Before the Rubanick trial, the court granted Monsanto's motion for an *Evidence Rule* 8 hearing to assess the qualifica-

tions and competence of plaintiff's expert in the case, Dr. Earl Balis. The hearing consumed three days. The court put the burden on Monsanto, the moving party, to present sufficient evidence to call into question the admissibility of the proffered testimony. The court therefore first received testimony from Monsanto's three experts (who were already familiar with Dr. Balis's theory, apparently from deposition testimony). Dr. Balis then testified as plaintiff's sole witness.

Dr. Balis holds a doctorate in biochemistry. Although recently retired at the time of the *Evidence Rule* 8 hearing, Dr. Balis had been a primary cancer researcher at the Sloan–Kettering Cancer Center in New York City for over thirty-seven years. He had headed a research group primarily concerned with investigating the cause, diagnosis, and treatment of colon cancer. He had also served as chairman of the Department of Biochemistry of the Cornell University Medical College. He was a member of the National Large Bowel Cancer Committee, and an associate editor of the publication *General Cancer Research*. He has personally authored or participated in the publication of approximately 170 scientific articles, of which approximately fifteen concern carcinogenesis. Dr. Balis was also part of a research team with Dr. Nancy Keminey, Rubanick's treating physician, who was not offered as a witness in this case. Dr. Balis never personally examined Rubanick. This was the first time that Dr. Balis had testified as an expert witness (he told the court he hoped it would be his last).

Dr. Balis's opinion that exposure to PCBs caused Rubanick's colon cancer was essentially based on the following factors: (1) the extremely low incidence of cancer in males under thirty; (2) Rubanick's personal history, *e.g.*, his diet, the fact that he was a non-smoker, and that he did not come from a "cancer family" (*i.e.*, a family whose members are at a high risk of cancer due to genetic predisposition to the disease); (3) the fact that 5 out of 105 employees at Witco developed some kind of cancer during the relevant period; (4) "a very large body of evidence" showing that PCBs produce cancer in experimental animals;

and (5) thirteen articles on the effects of exposure to PCBs on animals and human beings that, according to Dr. Balis, supported his opinion that PCBs are human carcinogens. Dr. Balis also summarized the evidence concerning the quantity of PCBs to which Rubanick had been exposed as follows:

that there was some thirty-five thousand parts per million PCBs in the soil around there, that he would come home covered with this stuff and the material was oozing out of his clothes, according to I guess it was his wife's testimony, it was something, and I think that report that he lifted these heavy drums and slopping around in this muddy PCB mix, and you also showed me some document about the State of New Jersey, some agency complaining about contamination from that stuff.

The trial court asked Dr. Balis whether his theory that PCBs cause cancer in human beings finds support in the scientific community. Answering that most of the scientific community "pays [no] attention to PCBs whatsoever," Dr. Balis noted that thirteen of the thirty-nine papers he had reviewed on the subject supported his opinion.

Monsanto's first witness was Dr. Thomas Fahey, a licensed physician and board certified internist. At the time of the hearing, Dr. Fahey was the deputy physician in charge of the Memorial Hospital at the Sloan–Kettering Cancer Institute and Associate Dean of Medicine at Cornell University Medical College. He had also served as associate chairman of the Department of Medicine at Memorial Hospital, where his responsibilities included overview of the hospital's oncology services. As an internist at the hospital, he had been directly involved in the care of patients suffering from different types of cancer, including colon cancer. Dr. Fahey, although familiar with epidemiological principles and their scientific uses, did not purport to be an expert in the field of epidemiology. He had done no primary research on carcinogenesis, nor had he ever conducted or participated in research involving the effects of PCBs on humans.

Although he acknowledged that a biochemist with primary research responsibilities would be more conversant with carcinogenesis literature than a treating clinical physician, Dr. Fa-

hey testified that he was nonetheless familiar with the literature. He testified that there are no published scientific studies to suggest that colon cancer has any relationship to PCB exposure, and that there is very little in the literature suggesting that PCBs are directly related to carcinogenesis in humans. Reviewing the studies and data on which Dr. Balis had based his conclusion that PCBs caused Rubanick's colon cancer, Dr. Fahey asserted that that conclusion was "really untenable from the scientific standpoint." He stated that

> there is no evidence that I have seen to this date that would definitively suggest that the individual actually did have extensive exposure to PCBs, and there's no evidence to suggest that his disease was different in any way from the usual ordinary run-of-the-mill colon cancer that we see in over a hundred forty thousand individuals a year in this country.

He found particularly objectionable Dr. Balis's use of studies showing that PCBs had caused cancer in animals, testifying that "it's well accepted now in the cancer field that you cannot extrapolate findings in one species to that of another." In response to the court's question whether there is "a substantial body of scientific thought that accepts as a proposition that human exposure to PCBs will give rise to any form of cancer," Dr. Fahey responded that there was not.

Monsanto's next witness was Dr. Raymond Harbison, who holds a Ph.D. in toxicology, as well as a degree in pharmacology. At the time of the hearing, Dr. Harbison was Director of Toxicology at the University of Arkansas in conjunction with the National Center for Toxicological Research. He had served as a consultant to the National Institute of Health on the toxicological effects of various environmental pollutants, as well as to the United States Environmental Protection Agency on the toxic effects on humans of exposure to PCBs. He had been directly involved with a medical and toxicological study of employees of a PCB disposal company in Arkansas. Dr. Harbison had testified on behalf of Monsanto on at least one prior occasion, in a case (*Amorello v. Monsanto Corp.*, 186 *Mich. App.* 324, 463 *N.W.*2d 487 (1990)) in which the issue was, as here, whether PCBs had caused the plaintiffs' injuries.

Dr. Harbison testified that there were many types of PCBs, and that their toxicity varied according to their chlorine content—the greater the chlorination, the greater the toxicity. He testified further that the types of PCBs manufactured by Monsanto had a relatively low chlorine content, and that he was aware of no studies indicating that PCBs of similar chlorine content were carcinogenic to animals. According to Dr. Harbison, there are approximately seventeen studies that have been conducted on the effects on humans of exposure to PCBs. He testified that none of those studies identified an increase in colon cancer, or for that matter, any kind of cancer, as a result of exposure to PCBs. On cross-examination, Dr. Harbison testified that he believed that exposure to PCBs actually reduced tumors.

Dr. Harbison was also asked by the court whether he was "aware of any substantial minority acceptance in the scientific community of the conclusion that Dr. Balis has reached on the evidence ... before him." Dr. Harbison answered that he was not. He further testified that Dr. Balis had not used the "scientific method" in arriving at his opinion. Harbison explained that what distinguishes scientists from other observers is "rigorous evaluation and methodology," and that an extremely high level of proof is required before scientists will accept a given theory.

Monsanto's last witness was Dr. Philip Cole, who testified as an expert epidemiologist. Dr. Cole is a licensed medical doctor and holds a Ph.D. from the Harvard School of Public Health, at which he also taught for ten years, reaching the position of full professor. At the time of the hearing, he was chairman of the Department of Epidemiology at the University of Alabama. He had served as the chairman of the National Cancer Institute committee on the causes of human cancer. He had also spent a year in the Department of Epidemiology of the International Agency for Research of Cancer.

Dr. Cole testified that there had been relatively few studies done on the effects of PCB exposure on human beings, and that the results of the studies had not been highly consistent. However, although he was unwilling to say that PCBs definitely do *not* cause cancer in human beings, he testified that the studies are "in the aggregate ... persuasive to the effect that there is little or no increase[d] risk of cancer among human beings" due to exposure to PCBs. Dr. Cole also testified that based on the manner in which Dr. Balis had apparently analyzed the data, he did not believe Balis to be qualified to interpret epidemiological evidence. Dr. Cole, too, was asked by the court whether he was "aware of any recognized valid scientific opinion, either as a consensus or as a substantial minority opinion, which would recognize PCBs as a causative factor in human cancer." Like Monsanto's other two witnesses, he answered that he was not. Dr. Cole acknowledged, however, that the committee of the International Agency for Research of Cancer on which he had sat had listed PCBs as a probable human carcinogen over his dissenting vote.

At the close of the hearing, the court determined that the expert testimony of Dr. Balis was inadmissible. It made the following findings: (1) that Dr. Balis was qualified to offer an opinion on human carcinogenesis generally; (2) that as a non-physician he was not qualified to offer an opinion on a specific patient's cancer and its possible causal relationship to PCBs; and (3) that the theory of causation Dr. Balis offered had not been generally accepted by the scientific community. 225 *N.J.Super.* at 492–503, 542 *A.2d* 975. The court accordingly granted defendant's motion to exclude Dr. Balis's testimony, and subsequently granted defendant's summary judgment motions against Rubanick and DeMaio, whose cause of action was based on the same theory of causation supported by the same expert.

The Appellate Division, in reversing the trial court, issued three separate opinions. 242 *N.J.Super.* 36, 576 *A.2d* 4. Judge Petrella, in the court's lead opinion, believed that the scope of

the *Evidence Rule* 8 hearing had been far too broad and voted to remand for trial. He wrote that a *Evidence Rule* 8 hearing should address only the issue of the expert's qualifications; other issues concerning the expert's testimony go to its weight and therefore should be determined by the jury. *Id.* at 47–48, 576 *A.*2d 4. Judge Stern also voted to remand for trial. Although he concluded that the record as presented at the *Evidence Rule* 8 hearing did not support Dr. Balis's conclusion that PCBs caused Rubanick's cancer, he believed that a fuller record developed at trial might provide grounds for its admissibility. *Id.* at 59, 576 *A.*2d 4. Judge Havey dissented, finding that the expert testimony was without support, and that the trial court judgment was therefore proper. *Id.* at 63, 576 *A.*2d 4. All three of the Appellate Division judges agreed, however, that the conventional standard for admissibility of evidence of causation applied by the trial court was too strict. *Id.* at 44, 576 *A.*2d 4 (Petrella, J.A.D.); *id.* at 58, 576 *A.*2d 4 (Stern, J.A.D., concurring); *id.* at 65, 576 *A.*2d 4 (Havey, J.A.D., dissenting).

Defendants appealed to this Court as of right. *R.* 2:2–1.

## II

Resolution of the issues in this case is dictated by our rules governing the admissibility of expert evidence. *Evidence Rule* 56(2) provides:

A witness qualified pursuant to *Rule* 19 as an expert by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In *State v. Kelly,* 97 *N.J.* 178, 208, 478 *A.*2d 364 (1984), the Court explained that in determining admissibility of expert testimony, the field of science "must be at a state of the art

such that an expert's testimony could be sufficiently reliable." Reliability can be established by demonstrating "general acceptance" of the expert's opinion or theory within the scientific or professional community. *Id.* at 210, 478 *A.*2d 364. "There are," we stated in *Windmere, Inc. v. International Ins. Co.*, 105 *N.J.* 373, 379, 522 *A.*2d 405 (1987), "generally three ways in which a proponent of expert testimony or scientific results can prove the required reliability in terms of its general acceptance within the scientific community: (1) the testimony of knowledgeable experts; (2) authoritative scientific literature; (3) persuasive judicial decisions which acknowledge such general acceptance of expert testimony." We have followed that approach for determining reliability of expert evidence in a variety of contexts. *E.g., ibid.* (reliability of spectrography, or voiceprint analysis); *State v. Kelly, supra,* 97 *N.J.* 178, 478 *A.*2d 364 (theory of "battered woman's syndrome"); *Romano v. Kimmelman,* 96 *N.J.* 66, 474 *A.*2d 1 (1984) (breathalyzer test); *State v. Cavallo,* 88 *N.J.* 508, 443 *A.*2d 1020 (1982) (diagnosis of tendency to commit rape on basis of rapist profile); *State v. Hurd,* 86 *N.J.* 525, 432 *A.*2d 86 (1981) (hypnotically refreshed testimony).

The trial court, here, relying primarily on *Windmere, Inc.,* determined that plaintiff's theory of causation was inadmissible because it had not been accepted by "at least a substantial minority of the applicable scientific community." 225 *N.J.Super.* at 498–500, 542 *A.*2d 975. All three Appellate Division judges, however, thought that the conventional "general acceptance" test of reliability is too stringent for determining the reliability of expert theories of causation in toxic-tort litigation because scientific knowledge of carcinogenesis is still evolving. Hence, the question posed by the several decisions of the lower courts is whether the Court must adhere to the conventional test of admissibility of expert testimony relating to new or developing theories of causation in toxic-tort litigation, because, in the terms used by *State v. Kelly, supra,* 97 *N.J.* at 208, 478 *A.*2d 364, that scientific knowledge is not "at a state of the art

such that an expert's testimony could be sufficiently reliable." Alternatively, the issue is whether the Court should fashion a broader standard for assessing the reliability of such evidence in this type of litigation.

We do not easily depart from the traditional test governing the admissibility of expert testimony. We have recognized the dangers of allowing the jury to consider expert testimony the reliability of which has not been sufficiently demonstrated. "[W]hen unreliable evidence is labeled 'expert,' juries might not accurately assess its weight." *Ryan v. KDI Sylvan Pools*, 121 *N.J.* 276, 285, 579 *A.*2d 1241 (1990) (citing *State v. Cavallo, supra*, 88 *N.J.* 508, 443 *A.*2d 1020). We have particularly emphasized the need for this reliability when a machine is used to displace the human functions in determining criminal guilt. *Romano v. Kimmelman, supra*, 96 *N.J.* 66, 474 *A.*2d 1. At the same time, we have recognized the extraordinary and unique burdens facing plaintiffs who seek to prove causation in toxic-tort litigation. *See Ayers v. Jackson Tp.*, 106 *N.J.* 557, 580–87, 525 *A.*2d 287 (1987). In *Ayers*, for example, a large class of plaintiffs had been exposed to toxic pollutants due to the township's negligent operation of a landfill. We recognized that

[b]y far the most difficult problem for plaintiffs to overcome in toxic tort litigation is the burden of proving causation. In the typical tort case, the plaintiff must prove tortious conduct, injury and proximate cause. Ordinarily, proof of causation requires the establishment of a sufficient nexus between defendant's conduct and the plaintiff's injury. In toxic tort cases, the task of proving causation is invariably made more complex because of the long latency period of illnesses caused by carcinogens or other toxic chemicals. The fact that ten or twenty years or more may intervene between the exposure and the manifestation of disease highlights the practical difficulties encountered in the effort to prove causation. Moreover, the fact that segments of the entire population are afflicted by cancer and other toxically-induced diseases requires plaintiffs, years after their exposure, to counter the argument that other intervening exposures or forces were the "cause" of their injury. [*Id.* at 585, 525 *A.*2d 287 (citations omitted).]

We recognize, too, that because of the extremely high level of proof required before scientists will accept a new theory, and particularly because of the current inability of science to fully

comprehend carcinogenesis, *see* Brennan, *Causal Chains and Statistical Links: The Role of Scientific Uncertainty in Hazardous–Substance Litigation*, 73 *Cornell L.Rev.* 469, 474–75 (1988), plaintiffs in toxic-tort litigation, despite strong and indeed compelling indicators that they have been tortiously harmed by toxic exposure, may never recover if required to await general acceptance by the scientific community of a reasonable, but as yet not certain, theory of causation.

Each of the judges of the Appellate Division reached the conclusion that the conventional standard for determining the reliability of scientific knowledge was inappropriate in the context of toxic-tort litigation. Judge Petrella wrote:

> The question here is not the acceptance of the "general acceptance" standard but whether there are sufficient factual and scientific underpinnings to the expert's causation theory, recognizing that in experimentation and study of known or suspected cancer causing agents as a rule they are not intentionally administered to humans because of the risks involved. [242 *N.J.Super.* at 44, 576 *A.2d* 4 (citation omitted).]

Judge Havey, in dissent, expressed essentially the same view on this issue:

> A simple mechanistic application of the "general acceptance" standard is not appropriate when the issue, as here, is whether a specific chemical has probably caused a particular disease.... [T]he question is whether there are sufficient factual and scientific underpinnings to the expert's causation theory. [*Id.* at 65, 576 *A.2d* 4.]

Judge Stern was in "full agreement with [his] colleagues that we are free to employ a broader standard when the issue concerns an expert opinion relating to the question of causation." *Id.* at 58, 576 *A.2d* 4.

The Appellate Division's unanimous recognition that there must be a different standard for determining the reliability of scientific theories of causation in toxic-tort litigation finds growing and impressive authoritative support. In recent years, a number of commentators have suggested that a broadened standard for determining the admissibility of causation theories in toxic-tort litigation is needed. See, *e.g.*, Delgado, *Beyond Sindell: Relaxation of Cause–in–Fact Rules for Indeterminate Plaintiffs*, 70 *Calif.L.Rev.* 881 (1982); Farber, *Toxic*

*Causation*, 71 *Minn.L.Rev.* 1219 (1987); King, *Causation, Valuation, and Choice in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 *Yale L.J.* 1353 (1981); Robinson, *Probabilistic Causation and Compensation for Tortious Risk*, 14 *J.Legal Stud.* 779 (1985); Rosenberg, *The Causal Connection in Mass Exposure Cases: A 'Public Law' Vision of the Tort System*, 97 *Harv.L.Rev.* 851 (1984); Note, *Pursuing a Cause of Action in Hazardous Waste Pollution Cases*, 29 *Buffalo L.Rev.* 533 (1980); Note, *The Inapplicability of Traditional Tort Analysis to Environmental Risks: The Example of Toxic Waste Pollution Victim Compensation*, 35 *Stan.L.Rev.* 575 (1983); Note, *Trans–Science in Torts*, 96 *Yale L.J.* 428 (1986); Note, *Tort Actions for Cancer: Deterrence, Compensation, and Environmental Carcinogenesis*, 90 *Yale L.J.* 840 (1981). See also Brennan, *Helping Courts with Toxic Torts: Some Proposals Regarding Alternative Methods for Presenting and Assessing Scientific Evidence in Common Law Courts*, 51 *U.Pitt.L.Rev.* 1 (1989) (discussing the difficulties in proving causation in toxic-tort litigation and proposing alternatives to litigation). Those authorities agree that both the delayed effects in toxic-tort cases—effects that may not manifest themselves for years after the occurrence of the responsible act or events—as well as the inability of current science to identify precisely the causes of cancer, create the need for a reasonable alternative to the traditional requirement of general acceptance as the primary measure of reliability of scientific knowledge for use in the tort system.

> The imprecision of estimating the impact of environmental and occupational carcinogens derives from the central uncertainty surrounding the nature of carcinogenesis. Like the study of toxicology in general, the lack of clear insights into the disease's molecular basis hampers the study of carcinogenicity.
>
>      \*     \*     \*     \*     \*     \*     \*     \*
>
> Given this central uncertainty regarding the cause of cancer, any given statement about the role of any agent as a carcinogen is hedged with assumptions and hypotheses. Because scientists do not yet understand the molecular model of carcinogenesis, it is impossible to state that a given carcinogen caused

any individual tumor. [Brennan, *supra*, 73 *Cornell L.Rev.* at 474, 475 (footnote omitted).]

Recovery in toxic-tort cases has typically been granted "only after a statistically significant number of deaths and injuries were incurred, allowing experts to quantify the hazard." Note, *supra*, 96 *Yale L.J.* at 429. The commentators therefore argue that the admissibility of a scientific theory of causation in toxic-tort litigation should not necessarily turn on its general acceptance by the scientific community. That acceptance entails the strict application of the scientific method, which requires an extraordinarily high level of proof based on prolonged, controlled, consistent, and validated experience. In the words of Dr. Harbison, "without that rigorous form of evaluation one has not used the scientific method, and the importance of the scientific method is to make certain that the observations that we make as scientists aren't in error." [1] The scientific method,

---

[1]Dr. Harbison, who testified on behalf of Monsanto, gave the following lengthy explanation of the scientific method, which illustrates the extraordinarily high level of proof required before scientists will accept a given theory:

The scientific method requires a rigorous evaluation of an observation that is being attempted to be correlated with exposure to some chemical.

To begin with, one has to have knowledge regarding the exposure and whether there was a dose and, further, whether that dose was sufficient to cause any adverse health effects or the effects that are being alleged. So, in the absence of that information regarding exposure and dose, one has a great uncertainty about trying to draw any sort of cause and effect relationship.

Secondly, there must be some temporal eligibility, that is the time between exposure and the effects must be such that there is some reasonable scientific support for the claim that that disease could occur within that period of time. And for cancer we know that there is a lag time of several decades between exposure and ultimate occurrence of a cancer or a tumor.

Third, there must be some scientific or medical precedence for the disease or the ailment. There has to be some human evidence that this disease has been seen and has been determined to be causally related to exposure to a substance. In the absence of that, one is for the first time

however, fails to address or accommodate the needs and goals of the tort system. Chief Judge Markey of the United States Court of Appeals for the Federal Circuit has stated:

The differences between the judicial and the scientific-technological processes are profound and pervasive. Failure to recognize that difference has led to judicial expressions of frustration and an unfortunate tendency to rest judicial decisions on current, and often transient, "truths" and "facts" of science and technology. The purpose and function of science is to learn physical facts....

The purpose and function of law is to resolve disputes and to facilitate a structure for the organization of a just society—in a word, to provide justice. [Markey, *Needed: A Judicial Welcome for Technology—Star Wars or Stare Decisis?*, 79 *F.R.D.* 209, 210 (1979).]

See also Handler, *The Judicial Pursuit of Knowledge: Truth and/or Justice*, 41 *Rutgers L.Rev.* 1, 26 (1988) ("[T]here are areas in which judicial need for certain facts equals or exceeds the scientific community's ability to establish them. Many cases present issues with respect to which courts have been forced intuitively to make assumptions on the basis of available knowledge....").

Judge Havey, dissenting below and drawing on our views expressed in *Ayers v. Jackson Tp.*, *supra*, 106 *N.J.* at 585, 525 *A.2d* 287, observed:

Plaintiffs face complex and unique practical difficulties in their effort to prove causation because of long latency periods between exposure and illness, as well as the countervailing proofs that the plaintiffs have encountered other intervening exposures or forces which may have been the "cause" of their injury or disease. In my view, an epidemiological study of recent vintage may stand alone in establishing a causal relationship between a specific chemical and human cancer. [*Id.* 242 *N.J.Super.* at 65, 576 *A.2d* 4 (citation omitted).]

---

sort of making this observation and again it requires a very rigorous evaluation of that observation.

\* \* \* \* \* \* \* \*

What distinguishes us from other observers is the rigorous evaluation and methodology that we use to make certain that the observation that we have made is real \* \* \*.

So, to further evaluate it, we would evaluate the statistical significance or the reliability of that observation to make sure that it hasn't occurred by chance alone, that it's not a spurious observation, and that there is a relationship between the exposure and the particular ailment.

Expressing similar concerns, several courts have taken a more flexible approach to the admission of causation theories in toxic-tort litigation. Those courts have looked not to whether the theories have been generally accepted by the scientific community, but rather to whether the scientific knowledge is sufficiently founded or based on a sound methodology, leaving the decision to credit the theory to the finder of fact.

In *Ferebee v. Chevron Chemical Co.*, 736 *F*.2d 1529, *cert. denied*, 469 *U.S.* 1062, 105 *S.Ct.* 545, 83 *L.Ed.*2d 432 (1984), the Court of Appeals for the District of Columbia Circuit took an approach similar to that of the Appellate Division below. In *Ferebee*, the plaintiffs, children of an agricultural worker who died of pulmonary fibrosis, brought survival and wrongful death actions against the defendant paraquat manufacturer, claiming that the worker died as a result of exposure to paraquat for a period of approximately ten years. The jury found for the plaintiffs after considering the sharply divided theories of causation proffered by each side. *Id.* at 1532.

On appeal, the defendant argued that the plaintiffs' theory of causation had not been generally accepted by the scientific community and was therefore inadmissible. The court rejected that argument, distinguishing between the test applied to "evidence based on novel scientific techniques or methodologies," and that applied to "such evidence ... involved in the admission of scientific opinion testimony that, while controversial in its conclusions, is based on well-founded methodologies." *Id.* at 1535 (citing *Reed v. State*, 283 *Md.* 374, 381, 391 *A.*2d 364, 368 (1978)). Judge Mikva, writing for a unanimous court of appeals, counselled judicial humility and neutrality with respect to assessing the reliability of a complex theory of causation in toxic-tort litigation:

Judges, both trial and appellate, have no special competence to resolve the complex and refractory causal issues raised by the attempt to link low-level exposure to toxic chemicals with human disease. On questions such as these, which stand at the frontier of current medical and epidemiological inquiry, if

experts are willing to testify that such a link exists, it is for the jury to decide whether to credit such testimony. [*Id.* at 1534.]

Judge Mikva continued:

[A] cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, such as the use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical. In a courtroom, the test for allowing a plaintiff to recover in a tort suit of this type is not scientific certainty but legal sufficiency; if reasonable jurors *could* conclude from the expert testimony that paraquat more likely than not caused Ferebee's injury, the fact that another jury might reach the opposite conclusion or that science would require more evidence before conclusively considering the causation question resolved is irrelevant. [*Id.* at 1535–36.]

A similar approach was taken by the court in *Wells v. Ortho Pharmaceutical Corp.*, 615 *F.Supp.* 262 (N.D.Ga.1985), *aff'd*, 788 *F.*2d 741, *reh'g denied*, 795 *F.*2d 89 (11th Cir.), *cert. denied*, 479 *U.S.* 950, 107 *S.Ct.* 437, 93 *L.Ed.*2d 386 (1986). There, the plaintiffs, an infant and her parents, contended that the infant's birth defects were caused by a spermicide manufactured by the defendant. At a bench trial, the plaintiffs presented a number of experts, including the child's treating physicians, who testified that the defects were caused by the spermicide, as well as several epidemiological studies generally indicating an association between spermicide use and deleterious effects on the fetus. *Id.* at 269–79. The defense presented their own experts who testified that no causal link between spermicide use and congenital defects had been established; they assailed the studies submitted by the plaintiffs, as well as the application of the studies to the present case, noting that an advisory committee of the Food and Drug Administration had deemed the product "safe and effective." *Id.* at 279–91.

The district court judge stated at the outset of his opinion that the court's task

was not to presume the expertise to resolve, once and for all, the dispute within the scientific community about the safety of spermicides. Rather, the Court's function was to render a legal decision, not a medical one. That is, the Court's

duty was to weigh carefully the evidence that *these* parties presented to *this* Court in the trial of *this* case and to determine with reference to the facts of the case at hand whether plaintiffs had satisfied their burden of proving that they were entitled to the relief sought. [*Id.* at 266.]

He acknowledged that "overall the studies failed to show conclusively whether or not the spermicide caused any or all of the birth defects suffered by [the infant]." *Ibid.* However, he stated,

[the] plaintiffs' ultimate burden was not to produce an unassailable scientific study which proves that spermicides have caused birth defects in rats, rabbits, or members of a large group health plan, but rather to show from *all* the evidence presented, to a reasonable degree of medical certainty, that the spermicide caused some or all of [the infant's] birth defects. [*Ibid.*]

After reviewing at length all the expert testimony presented in the case, *id.* at 269–91, the court found for the plaintiffs. *Id.* at 292.

The Eleventh Circuit Court of Appeals affirmed the district court's judgment. 788 *F.*2d 741. The court, relying heavily on *Ferebee,* stated:

[I]t does not matter in terms of deciding the case that the medical community might require more research and evidence before conclusively resolving the question. What matters is that this particular factfinder found sufficient evidence of causation in a legal sense in this particular case, and that that finding is not clearly erroneous. [*Id.* at 745.]

Other courts have been similarly persuaded by the reasoning that supports a methodology-based standard for determining reliability with respect to novel or emerging complex scientific theories of causation. See *Graham v. Wyeth Laboratories, Inc.,* 906 *F.*2d 1399, 1404 (10th Cir.) (plaintiffs' experts could testify that diptheria, tetanus and pertussis vaccination caused plaintiffs' brain damage), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 511, 112 *L.Ed.*2d 523 (1990); *Christophersen v. Allied–Signal Corp.,* 902 *F.*2d 362, 363–67 (plaintiffs' sole expert could testify that exposure to fumes containing nickel and cadmium caused decedent's colon cancer; expert causation opinion should be excluded only if "fundamentally unsupported" and "would not actually assist the jury in arriving at an intelligent and sound verdict"), *reh'g granted,* 914 *F.*2d 66 (5th Cir.1990); *Osburn v.*

*Anchor Laboratories, Inc.*, 825 *F*.2d 908, 914–16 (plaintiffs' experts could testify that chloramphenicol caused user's leukemia; an expert's opinion "need not be generally accepted in the scientific community before it can be sufficiently reliable and probative to support a jury finding"), *reh'g denied*, 834 *F*.2d 425 (5th Cir.1987), *cert. denied*, 485 *U.S.* 1009, 108 *S.Ct.* 1476, 99 *L.Ed.*2d 705 (1988); *Mason v. Texaco, Inc.*, 741 *F.Supp.* 1472, 1476 (D.Kan.1990) (plaintiff's expert could testify that benzene caused decedent's leukemia; whether to credit the testimony is for the jury to decide); *Longmore v. Merrell Dow Pharmaceutical*, 737 *F.Supp.* 1117, 1118–21 (D.Idaho 1990) (plaintiffs' experts could testify that Bendectin caused birth defects despite defendant's presentation of thirty-five epidemiological studies showing no causal connection; "the battling experts make summary judgment inappropriate"); *Friedman v. F.E. Myers Co.*, 706 *F.Supp.* 376 (E.D.Pa.1989) (plaintiffs' experts could testify that PCBs caused the plaintiffs' various illnesses; "it will be for the jury to hear plaintiffs' expert testimony on causation and give it whatever weight is appropriate"); *Bandura v. Orkin Exterminating Co.*, 664 *F.Supp.* 1218, 1219–20 (N.D.Ill.1987) (plaintiffs' expert could testify that termiticide caused their various illnesses), *aff'd*, 865 *F*.2d 816 (7th Cir.1988); *Baroldy v. Ortho Pharm. Co.*, 157 *Ariz.* 574, 580–83, 760 *P*.2d 574, 580–83 (Ct.App.1988) (plaintiffs' experts could testify that the diaphragm manufactured by defendant caused the user to suffer toxic-shock syndrome; the "general acceptance" test is appropriately applied to a procedure or technique, but not to "a scientific hypothesis of causation"); *Oxendine v. Merrell Dow Pharmaceutical, Inc.*, 506 *A*.2d 1100 (D.C.1986) (plaintiffs' sole expert could testify that Bendectin caused child's birth defects; the jury must decide whether to credit the testimony); *Earl v. Cryovac*, 115 *Idaho* 1087, 772 *P*.2d 725 (Ct.App.1989) (plaintiff's experts could testify that his pulmonary disease was caused by exposure to vapors emitted from a plastic film manufactured by the defendant; the trial court had erred in granting summary judgment where "reason-

able minds could find, or at least could disagree regarding, a causal connection between the plaintiff's disease and [the defendant's] product"); *cf. Ealy v. Richardson–Merrell, Inc.*, 897 *F.*2d 1159 (D.C.Cir.) (Mikva, J.) (plaintiffs' expert testimony that Bendectin caused child's birth defects inadmissible when the "wealth of epidemiological data" showed no causal connection), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 370, 112 *L.Ed.*2d 332 (1990); *Richardson v. Richardson–Merrell, Inc.*, 857 *F.*2d 823 (D.C.Cir.1988) (same), *cert. denied,* —— *U.S.* ——, 110 *S.Ct.* 218, 107 *L.Ed.*2d 171 (1989).

There are, assuredly, genuine concerns engendered by a test of reliability of complex scientific theories of causation that does not fully embrace the views of the dominant or of a significant segment of the scientific community. *See, e.g.,* Black, "A Unified Theory of Scientific Evidence," 56 *Fordham L.Rev.* 595, 672–73 (1988) (criticizing *Ferebee* as "represent[ing] an open retreat from scientific standards.... In effect, the court miscast science in terms of absolute certainty only to cast it aside;" and criticizing *Wells* as "show[ing] the full consequences of stretching the *Ferebee* standard to its limits. ... [I]gnoring science meant the rejection of valid evidence favorable to the defendant."). Some courts have continued to look more closely at new causation theories by either requiring general acceptance by the scientific community or exercising active and close judicial scrutiny of the methodology on which the theories are based.

In *Johnston v. United States*, 597 *F.Supp.* 374 (D.Kan.1984), the plaintiffs brought suit against the United States under the Federal Tort Claims Act, contending that their respective cancers were caused by exposure to radiation in the aircraft factory where they were employed. The United States was the primary supplier of the parts from which the radiation originated. *Id.* at 375. The plaintiffs presented several eminent expert witnesses who testified that the plaintiffs' cancers were causally related to the radiation in the plant. *Id.* at 379–83. The court, finding for the government, criticized plaintiffs' expert

testimony. It determined that the experts had not premised their opinions on reliable or significant evidence, *id.* at 410, or to account for the amount of exposure. *Id.* at 401–02, 408. The court concluded that experts' opinions did not represent "the views of the vast majority of competent, respected scientists in this field," but rather "the views of an extreme minority of scientists." *Id.* at 410–11.

In *In re "Agent Orange" Products Liability Litigation,* 611 *F.Supp.* 1223 (E.D.N.Y.1985) (*Agent Orange*), *aff'd,* 818 *F.*2d 187 (2d Cir.1987), *cert. denied,* 487 *U.S.* 1234, 108 *S.Ct.* 2898, 101 *L.Ed.*2d 932 (1988), the plaintiffs were Vietnam veterans and their families claiming a wide array of health problems due to the veterans' exposure to the herbicide Agent Orange. Following plaintiffs' withdrawal from the settlement of a class action, the defendants, seven chemical companies, moved for summary judgment, submitting a number of epidemiological studies that failed to demonstrate a causal connection between Agent Orange and the health problems suffered by the veterans. *Id.* at 1231–34. In opposition to the defendants' motion, the plaintiffs submitted their own studies, conducted on both animals and on industrial workers, as well as experts' affidavits. Judge Weinstein summarily rejected the plaintiffs' studies, concluding that "[n]one of these studies do[es] more than show that there may be a causal connection between dioxin [the toxic chemical contained in Agent Orange] and disease. None show[s] a causal connection between plaintiffs and Agent Orange." *Id.* at 1234. With respect to the opinions of the plaintiffs' experts as expressed in their affidavits, Judge Weinstein began by stating that "[e]ven most of plaintiffs' experts express doubt about causation, except for some ill-defined possible 'association' as compared with associations with any specific other products or natural carcinogens." *Ibid.* Judge Weinstein concluded that one affidavit "amounts to this: the [veterans] complain of various medical problems; animals and workers exposed to extensive dosages of [dioxin] have suffered from related difficulties; therefore, assuming nothing else

caused the affiants' afflictions, Agent Orange caused them." *Id.* at 1237–38. He also concluded that another affidavit was flawed because it provided "no showing that the incidence of the diseases relied upon are greater in the Agent Orange-exposed population than in the population generally." *Id.* at 1239.

Understandably, other courts have expressed views similar to those of *Johnston* and *Agent Orange.* See *Brock v. Merrell Dow Pharmaceutical, Inc.,* 874 *F.*2d 307, 310 (in finding plaintiffs' expert testimony that Bendectin caused child's birth defects inadmissible, court praised *Agent Orange* and criticized *Ferebee* for not being "willing to analyze the reasoning employed by experts to reach their conclusions"), *modified on other grounds,* 884 *F.*2d 166 (5th Cir.1989), *cert. denied,* —— *U.S.* ——, 110 *S.Ct.* 1511, 108 *L.Ed.*2d 646 (1990); *Sterling v. Velsicol Chem. Co.,* 855 *F.*2d 1188, 1209 (6th Cir.1988) (without a widely accepted medical basis for their conclusions, the plaintiffs' experts' opinions were insufficient to sustain the plaintiffs' burden of proof that contaminated water damaged their immune system); *Lynch v. Merrell–Nat'l Laboratories,* 830 *F.*2d 1190, 1194 (1st Cir.1987) (plaintiffs' expert could not testify based on several studies that Bendectin caused child's birth defects in the absence of any confirmatory epidemiological data); *Mazur v. Merck & Co.,* 742 *F.Supp.* 239 (E.D.Pa.1990) (plaintiffs' expert testimony that measles, mumps, and rubella vaccine caused user's terminal disease of central nervous system inadmissible; court determined that literature on which experts had relied suggested only "a possible causal connection"); *Marder v. G.D. Searle & Co.,* 630 *F.Supp.* 1087 (D.Md. 1986) (plaintiffs' expert testimony that intrauterine device caused their various injuries inadmissible because the experts did not "make unqualified assertions of causation"), *aff'd sub nom. Wheelahan v. G.D. Searle & Co.,* 814 *F.*2d 655 (4th Cir.1987); *Amorello v. Monsanto Corp., supra,* 463 *N.W.*2d 487 (plaintiffs' expert testimony that PCBs caused their various illnesses inadmissible).

Nevertheless, because their demands for near-scientific certainty are unrealistic, if not impossible, the views of *Johnston* and *Agent Orange* have not escaped detractors. Thus, *Johnston* was criticized for insisting on a level of scientific proof that was simply not available.

> In denying the plaintiffs recovery, the court refused to interpret the Kansas causation standard requiring proof to meet a "reasonable degree of medical certainty" as only meaning that the bulk of scientifically available data support plaintiffs. Instead, the court held that the specification necessitated "medical certainty" that plaintiffs' exposure to radiation was the cause of their resulting cancer—an imperative well beyond the capability of contemporary science. [Note, *supra*, 96 *Yale L.J.* at 428.]

Of *Agent Orange*, one commentator concluded that "[t]he judge's decision is ... wrong from a toxicological point of view" because the court ignored animal data and other toxicological studies, paid insufficient attention to positive epidemiological studies that were not specific studies of Agent Orange and veterans, and placed too much weight on the defendant's negative epidemiological studies. Brennan, *supra*, 51 *U.Pitt. L.Rev.* at 56.

The Court of Appeals for the Third Circuit has rejected the general acceptance test as either a necessary or sufficient condition for determining the reliability and admissibility of expert testimony relating to new and emerging fields of science. Its approach, drawn from the standard of *Federal Rules of Evidence* 702 and 703, is that admissibility of such evidence should be governed by whether the basis for expert testimony consists of "facts or data ... of a type reasonably relied upon by experts in the particular field," and whether the expert's technique or methodology in using the facts or data is well-founded. *United States v. Downing,* 753 *F.*2d 1224, 1237 (3d Cir.1985); *accord DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 *F.*2d 941 (3d Cir.1990). In determining whether the facts or data are admissible, "[t]he proper inquiry is not what the court deems reliable, but what experts in the relevant discipline deem it to be." *In re Japanese Elec. Prods.,* 723 *F.*2d 238, 276 (3d Cir.1983), *rev'd on other grounds,* 475 *U.S.*

574, 106 *S.Ct.* 1348, 89 *L.Ed.*2d 538 (1986). In determining whether the scientific methodology is admissible, the court must

> conduct a preliminary inquiry focusing on (1) the soundness and reliability of the process or technique used in generating the evidence, (2) the possibility that admitting the evidence [will] overwhelm, confuse, or mislead the jury, and (3) the proffered connection between the scientific research or test result to be presented, and particular disputed factual issues in the case. [*United States v. Downing, supra*, 753 *F.*2d at 1237 (footnote omitted).]

That general approach has been followed to determine the reliability of scientific theories of causation in toxic-tort litigation involving exposure to PCBs. *E.g., Hines v. Consolidated Rail Corp.*, 926 *F.*2d 262 (3d Cir.1991); *In re Paoli R.R. Yard PCB Litigation*, 916 *F.*2d 829 (3d Cir.1990) (*Paoli*), *cert. denied*, —— *U.S.* ——, 111 *S.Ct.* 1584, 113 *L.Ed.*2d 649 (1991). In both those cases, plaintiffs claimed that their various illnesses were caused by exposure to PCBs. In both cases, the district courts had granted summary judgment for the defendants after reviewing the expert testimony to be presented by both sides. The Court of Appeals for the Third Circuit reversed and remanded each case, finding that the district courts had not sufficiently developed the record to make proper determinations of admissibility under *Federal Rules of Evidence* 702 and 703. Critical in each case was whether the data relied on by the respective experts were "of a type reasonably relied upon by experts in the particular field." *Fed.R.Evid.* 703. In *Paoli*, the plaintiffs' experts relied on data similar to that relied on by Dr. Balis in forming his opinion in this case. See 916 *F.*2d at 838–41. The court stated that "it appears ... that most of the data upon which the plaintiffs' experts rely is 'of a type reasonably relied upon by experts in the particular field,' Fed.R.Evid. 703, and thus admissible under Rule 703." *Id.* at 854 n. 29. Likewise, in *Hines*, the plaintiff's expert's evaluation was derived from sources and based on a methodology similar to those used by Dr. Balis, including the victims' personal, occupational, and family histories, as well as scientific articles and administrative findings on the toxicity of PCBs. 926 *F.*2d at 266–67. See also

*Friedman v. F.E. Myers Co., supra,* 706 *F.Supp.* 376 (with respect to whether there was causal relationship between PCB exposure and illness, "once the trial court finds that the data is such that experts in the field reasonably rely upon, the trial court should not separately determine the trustworthiness of the data" (citing *In re Japanese Elec. Prods., supra,* 723 *F.*2d at 275–79)).

■ The approach taken by the Court of Appeals for the Third Circuit for determining the reliability of emerging scientific theories of causation in toxic-tort cases is compatible with our own rules of evidence. *Evidence Rule* 56(2), like its federal counterpart, authorizes the consideration of data and information if they are of the "type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." We have noted with approval the rule of the Third Circuit in accepting expert opinion based on data generally relied on by experts in the field. *Ryan v. KDI Sylvan Pools, Inc., supra,* 121 *N.J.* at 288, 579 *A.*2d 1241 (citing *In re Japanese Elec. Prods., supra,* 723 *F.*2d 238). Although the proponent of an expert opinion must demonstrate that the data or information used were soundly and reliably generated and are of a type reasonably relied on by comparable experts in the particular field, our rule does not insist on a demonstration of the objective reliability of the opinions reached or the inferences drawn from such data or information. We have recognized that a novel or relatively new scientific theory may be found sufficiently reliable, even though it is controversial and its acceptance is not widespread, if it is based on a sound methodology that draws on scientific studies reasonably relied on in the scientific community, and has actually been used and applied by responsible experts or practitioners in the particular field. *See, e.g., State v. Kelly, supra,* 97 *N.J.* 178, 478 *A.*2d 364 (relatively new theory of the battered-woman's syndrome). Further, the cogency of other judicial decisions that have scrutinized, assessed, and found acceptable new and emerging scien-

tific knowledge can be persuasive. *Id.* at 224–25, 478 *A.*2d 364 (Handler, J., concurring in part and dissenting in part).

The Third Circuit's approach requires two separate reliability determinations—one for the data on which the expert relies in formulating his or her theory, and one for the methodology used by the expert in interpreting the data. That approach is based on the seemingly separate requirements of *Federal Rules of Evidence* 702 and 703 to evaluate, respectively, the expert's data and methodology. However, we do not believe that a rigid dichotomy is necessary. In *Paoli*, the Third Circuit recognized that the dichotomy "is ofttimes subtle if not strained." 916 *F.*2d at 856. Furthermore, *Federal Rules of Evidence* 702 and 703 are combined and incorporated in our single *Evidence Rule* 56(2). See *Ryan v. KDI Sylvan Pools, Inc., supra,* 121 *N.J.* at 288, 579 *A.*2d 1241 (suggesting that a single determination of reliability is involved). As Judges Petrella and Havey both recognized and expressed in this case, the essentials "are sufficient factual and scientific underpinnings to the expert's theory of causation." 242 *N.J.Super.* at 44, 576 *A.*2d 4; *id.* at 65, 576 *A.*2d 4.

There are undeniable indications that persons do in fact suffer grave and lethal injury as a result of the wrongful or tortious exposure to toxic substances. Those indications do not spring simply from conjecture; they conform to our common experience and informed intuition. Judge Petrella noted in his opinion below that "[i]t has been widely considered that PCBs are a carcinogenic substance." 242 *N.J.Super.* at 45, 576 *A.*2d 4 (citations omitted). *See also* Note, "Tort Actions for Cancer," *supra,* 90 *Yale L.J.* at 850 ("There is agreement that most cancers result from exposure to environmental factors."). Our common sense, with some empirical support, tells us of the deleterious effects of PCBs. Referring to the federal Toxic Substance Control Act, 15 *U.S.C.* § 2601 to 2671 (1988) (TSCA) (which devotes an entire section (section 6(e)) to the regulation of PCBs), the court in *Environmental Defense Fund v. Environmental Protection Agency,* 636 *F.*2d 1267, 1271 (D.C.Cir.

1980) observed: "The special attention accorded to PCBs in the [TSCA] resulted from the recognized seriousness of the threat that PCBs pose to the environment and human health."

However, toxic-tort litigation does not frequently encounter well-established and widely-accepted scientific theories of causation that can, at the level demanded by the scientific method, precisely delineate the causal path between the toxin and the pathology. Nevertheless, in such litigation there is often available data and information of a type that is used and relied on by experts in the field; further, there are reputable and highly qualified experts who, drawing on such data and information, have the proficiency to apply sound scientific methods sufficient to reach creditable opinions with respect to causation. We are thus strongly persuaded that a standard that accounts for those considerations should be employed to determine the reliability of expert opinion testimony relating to causation in toxic-tort litigation.

■ Accordingly, we hold that in toxic-tort litigation, a scientific theory of causation that has not yet reached general acceptance may be found to be sufficiently reliable if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field. The evidence of such scientific knowledge must be proffered by an expert who is sufficiently qualified by education, knowledge, training, and experience in the specific field of science. The expert must possess a demonstrated professional capability to assess the scientific significance of the underlying data and information, to apply the scientific methodology, and to explain the bases for the opinion reached.

■ We appreciate that the process for determining the admissibility of such scientific evidence will be complicated and the ultimate decision difficult. In determining if the scientific methodology is sound and well-founded, courts should consider whether others in the field use similar methodologies. "What

is necessary is that the expert arrived at his causation theory by relying upon *methods* that other experts in his field would reasonably rely upon in forming their own, possibly different opinions, about what caused the patient's disease." *Osburn v. Anchor Laboratories, Inc., supra,* 825 *F.*2d at 915; *see Hines v. Consolidated Rail Corp., supra,* 926 *F.*2d at 274 (plaintiff's expert used "traditional methods ... by reviewing a variety of background factors that are normally investigated in the medical profession," including the plaintiff's history of exposure to other toxins, drugs, and alcohol, the length of his residences, employment experience, various medical tests, and "all of the scientific literature that indicates that PCBs can be associated with severe health problems, including cancer"); *Ferebee v. Chevron Chem. Co.,* 736 *F.*2d at 1536 (examples of reliable methodologies included the use of tissue samples, standard tests, and patient examinations). As reflected in our own rule, *Evid.R.* 56(2), it is not essential that there be general agreement with the opinions drawn from the methodology used. There must merely be some expert consensus that the methodology and the underlying data are generally followed by experts in the field. See *Bandura v. Orkin Exterminating Co., supra,* 664 *F.Supp.* at 1219 ("The implications of [a] study are open to debate, but precisely for that reason plaintiff's expert was entitled to describe the study and explain his interpretation to the jury.").

The trial court in this case did not apply this methodology-based standard. Without deciding the matter, we note that the record suggests that Dr. Balis's methodology could be found to be sound and well-founded. Dr. Balis explained his methodology. See discussion, *supra* at 426–427, 593 *A.*2d 735–736. He relied on his review of Rubanick's personal and family histories, articles and studies on the effects, in both animals and human, of exposure to PCBs and the extremely low incidence of cancer in males under thirty. Dr. Balis also considered circumstantial evidence, such as the extent to which Rubanick was exposed to PCBs and the relatively high inci-

dence of cancer at Witco during the relevant period of time. See *Earl v. Cryovac, supra,* 115 *Idaho* 1087, 772 *P.*2d 725 (expert may rely on circumstantial evidence such as the plaintiff's suffering a worsening of symptoms while on the job and an improvement when he was not working). As noted in *Hines,* the court could "believe that [the expert] used traditional methods to form his opinion by reviewing a variety of background factors that are normally investigated in the medical profession.... Thus, even though [the expert's] opinion could be considered to be 'novel,' it appears that ... his methods were not." 926 *F.*2d at 274 (citation omitted).

■■ We do not believe that in determining the soundness of the methodology the trial court should directly and independently determine as a matter of law that a controversial and complex scientific methodology is sound. The critical determination is whether comparable experts accept the soundness of the methodology, including the reasonableness of relying on this type of underlying data and information. Great difficulties can arise when judges, assuming the role of scientist, attempt to assess the validity of a complex scientific methodology. *Compare* Brennan, *supra,* 51 *U.Pitt.L.Rev.* at 56 (criticizing the court in *Agent Orange, supra,* 611 *F.Supp.* 1223, for having an inadequate understanding of toxicology in rejecting the plaintiffs' expert testimony on causation), *with Black, supra,* 56 *Fordham L.Rev.* at 673–74 (criticizing court in *Wells v. Ortho Pharmaceutical Corp., supra,* 615 *F.Supp.* 262, for admitting the plaintiffs' expert testimony that the spermicide manufactured by the defendant had caused birth defects in the face of considerable medical evidence that spermicides do not cause such injuries). Nevertheless, the trial court here "independently reviewed" each of the thirteen studies on which Dr. Balis relied, and decided that they "do not say what plaintiff's expert concludes." 225 *N.J.Super.* at 502, 542 *A.*2d 975. In engaging in such an analysis, the court substituted its own assessment of the studies for that of an acknowledged expert. As the Appellate Division, citing *Ryan v. KDI Sylvan Pools,*

*supra*, 121 *N.J.* at 289, 579 *A.*2d 1241, recently recognized, "[t]he interpretation of the data ... is the function of the qualified expert.... [C]ourts should be loath to determine whether the particular expert has properly relied upon data which experts in the field generally rely on." *Grassis v. Johns–Manville Corp.*, 248 *N.J.Super.* 446, 455, 591 *A.*2d 671 (1991) (footnote omitted). Thus, the inquiry is not the reliability of the expert's ultimate opinion nor is it whether the expert thought his or her own reliance on the underlying data was reasonable, *see Ryan*, 121 *N.J.* at 287, 579 *A.*2d 1241, nor whether the court thinks that the expert's reliance was reasonable, *id.* at 289, 579 *A.*2d 1241. The proper inquiry is whether comparable "experts in the field [would] actually rely" on that information. *Ibid.*

The qualifications of the expert proffering relatively new scientific knowledge must be factored into the determination of the soundness of the methodology used. The trial court believed that, as a non-physician, Dr. Balis was not qualified to testify to the specific cause of Rubanick's colon cancer. 225 *N.J.Super.* at 492–95, 542 *A.*2d 975. However, plaintiff's expert indisputably was possessed of "extraordinary expertise." 242 *N.J.Super.* at 58, 576 *A.*2d 4 (Stern, J.A.D., concurring). We are in complete agreement with Judge Petrella's observation below: "It may be argued that by virtue of his specialization and research background in cancer [Dr. Balis] was more qualified than a medical doctor who is involved with the care and treatment after the fact of cancer development in patients, and including certain of the experts produced by Monsanto." 242 *N.J.Super.* at 48 n. 8, 576 *A.*2d 4. *See also Paoli, supra,* 916 *F.*2d at 855–56 (that an expert has never examined a patient and is not a physician is not a proper basis for excluding that expert's testimony). In sum, the record strongly indicates that at the trial level the court could ascribe great weight to Dr. Balis's qualifications in assessing the soundness of his methodology.

The necessary inquiry into the expert's qualifications implicates an additional concern relating to "the hired gun phenomenon," *i.e.*, that "[a]n expert can be found to testify to the truth of almost any factual theory, no matter how frivolous." Weinstein, *Improving Expert Testimony*, 20 *U.Rich.L.Rev.* 473, 482 (1986). "[J]uries can be misled by highly paid experts who will find at least some support in the voluminous scientific literature for any position, even when that position is repudiated by the majority of scientists." Brennan, *supra*, 51 *U.Pitt.L.Rev.* at 4; *see also* Black, *supra*, 56 *Fordham L.Rev.* at 679 (courts can "lose control of scientific evidence" "[w]hen courts accept qualified, willing testifiers."). The "hired gun" argument, however, cuts both ways.

> Well-funded defense attorneys can afford to hire expensive and prestigious experts who will find error in even the best epidemiological studies and discount any adverse evidence. Plaintiff's attorneys can identify a small cadre of well-versed toxicologists who will testify that a causal connection exists even when there is no evidence at all. [Brennan, *supra*, 51 *U.Pitt.Rev.* at 20.]

For example, Dr. Harbison has previously testified on behalf of Monsanto. See *supra* at 428, 593 *A.*2d at 736. Dr. Cole was a dissenting voice on the International Agency for Research of Cancer, which listed PCBs as a probable human carcinogen. See *supra* at 430, 593 *A.*2d at 737. The answer to the problem should not entail the adherence to a standard of admissibility that will automatically foreclose reliable and credible expert evidence that can assist a finder of fact. Rather, the response should consist of greater judicial vigilance in scrutinizing the status of the expert and in directing the factfinder to those factors that bear relevantly on the expert's credibility. That judicial attitude was described in *Wells v. Ortho Pharmaceutical Corp.*:

> In assessing the credibility of these witnesses, the Court considered each expert's background, training, experience, and familiarity with the circumstances of this particular case; and the Court evaluated the rationality and internal consistency of each expert's testimony in light of all the evidence presented. The Court paid close attention to each expert's demeanor and tone. Perhaps most important, the Court did its best to ascertain the motives, biases, and interests that might have influenced each expert's opinion. [615 *F.Supp.* at 266–67.]

■ In sum, we determine that there are sound reasons for adopting a broadened standard for determining the reliability and admissibility of scientific theories of causation in toxic-tort litigation. We note further that the Appellate Division judges differed with respect to the scope of the *Evidence Rule* 8 hearing in determining the predicates for admissibility of expert evidence. 242 *N.J.Super.* 36, 576 *A.2d* 4. Consistent with this opinion, the trial court, when faced with a not yet generally accepted theory of causation in toxic-tort litigation, should use the *Evidence Rule* 8 hearing to assess the soundness of the proffered methodology and the qualifications of the expert.

## III

As earlier noted, the judgment of the Appellate Division was that the testimony of plaintiffs' expert was admissible and to remand the matter for trial. We conclude that the admissibility of expert testimony in the context of this case must be determined under the standard herein adopted. Accordingly, we modify the judgment of the Appellate Division and remand the matter for proceedings consistent with this opinion.

*For modification and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.