NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5711-17
A-5717-17

STEPHEN LANZO, III
and KENDRA LANZO,

      Plaintiffs-Respondents,

v.

CYPRUS AMAX MINERALS
COMPANY, Individually and as
Successor-in-Interest to American
Talc Company, Metropolitan Talc
Company, Inc., Charles Mathieu,
Inc., Resource Processors, Inc., and
Windsor Minerals, Inc.,  CYPRUS
MINERALS CO., Individually and
as Successor-in-Interest to American
Talc Company, Metropolitan Talc
Company, Inc., Charles Mathieu,
Inc., Resource Processors, Inc., and
Windsor Minerals, Inc., JOHNSON
& JOHNSON, and WHITTAKER
CLARK & DANIELS, INC.,
Individually and as Successor-in-
Interest to American Talc Company,
Metropolitan Talc Company, Inc.,
Charles Mathieu, Inc., and Resource
Processors, Inc.,

      Defendants,

and

> **APPROVED FOR PUBLICATION**
>
> **April 28, 2021**
>
> **APPELLATE DIVISION**

IMERYS TALC AMERICA, INC.,
f/k/a LUZENAC AMERICA, INC.,
Individually and as Successor-in-
Interest to Windsor Minerals, Inc.,
and JOHNSON & JOHNSON
CONSUMER INC., f/k/a JOHNSON
& JOHNSON CONSUMER
COMPANIES, INC.,

      Defendants-Appellants.

_____

Argued March 9, 2021 – Decided April 28, 2021

Before Judges Yannotti, Haas, and Mawla

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-7385-16.

Roman Martinez (Latham & Watkins LLP) of the New York and District of Columbia bars, admitted pro hac vice, argued the cause for appellant Imerys Talc America, Inc. (Chasan, Lamparello, Mallon & Cappuzzo, PC, Roman Martinez, and Elana Nightingale Dawson (Latham & Watkins LLP) of the Illinois and District of Columbia bars, admitted pro hac vice, attorneys; Cindy Nan Vogelman, Roman Martinez and Elana Nightingale Dawson, on the briefs).

E. Joshua Rosenkranz (Orrick, Herrington & Sutcliffe LLP) of the New York bar, admitted pro hac vice, argued the cause for appellant Johnson & Johnson Consumer, Inc. (McCarter & English LLP, E. Joshua Rosenkranz, Robert M. Loeb (Orrick, Herrington & Sutcliffe LLP) of the District of Columbia bar, admitted pro hac vice, Paul David Meyer (Orrick, Herrington & Sutcliffe LLP) of the California bar , admitted pro hac vice, and Naomi J. Scotten (Orrick, Herrington &

2

Sutcliffe LLP) of the New York, Virginia, and District of Columbia bars, admitted pro hac vice, attorneys; John C. Garde, E. Joshua Rosenkranz, Robert M. Loeb, Paul David Meyer, Naomi J. Scotten, and Evan M. Rose, on the briefs).

Denyse Clancy (Kazan McClain Satterley & Greenwood) of the California bar, admitted pro hac vice, argued the cause for respondents Stephen Lanzo, III and Kendra Lanzo (Levy Konigsberg LLP, and Denyse Clancy, attorneys; Moshe Maimon and Denyse Clancy, on the briefs).

The opinion of the court was delivered by

YANNOTTI, P.J.A.D.

Johnson & Johnson Consumer Inc. (JJCI) and Imerys Talc America, Inc. (Imerys) appeal from a judgment dated April 23, 2018, which awarded plaintiffs Stephen Lanzo III and his wife Kendra Lanzo $117 million in compensatory and punitive damages, and other orders entered by the trial court during the course of this litigation. JJCI's appeal is docketed as A-5717-17, and Imerys' appeal is docketed as A-5711-17. We address both appeals in this opinion. For the following reasons, we reverse and remand the matter to the trial court for new, separate trials against JJCI and Imerys.

I.

On December 23, 2016, plaintiffs filed a complaint against Cyprus Amax Minerals Company (Cyprus Amax) and Cyprus Minerals Company

3

(collectively, Cyprus), Johnson & Johnson (J&J), JJCI, Imerys, and Whittaker Clark & Daniels, Inc. (Whittaker).  Plaintiffs asserted claims under the common law and the New Jersey Products Liability Act (PLA), N.J.S.A. 2A:58C-1 to -11.

Plaintiffs claimed Mr. Lanzo contracted mesothelioma from his long-term use of Johnson Baby Powder (JBP) and J&J's Shower to Shower talcum powder (SS).  J&J and JJCI produced, marketed, and sold JBP and SS using J&J's own talc or talc supplied by other defendants.[1]  Plaintiffs alleged the products contained asbestos.  In the complaint, Ms. Lanzo asserted a claim for the loss of her spouse's services, society, and consortium.

Prior to trial, the judge considered and ruled upon several motions.  The judge granted summary judgment in favor of Whittaker and dismissed the claims against this defendant with prejudice.  The judge also granted partial summary judgment in favor of Imerys and Cyprus Amax and dismissed all common law claims against them.

The judge also granted partial summary judgment to J&J and JJCI and dismissed all common law claims but permitted plaintiffs' design-defect and failure-to-warn claims under the PLA to proceed against these defendants.  The

---

[1] In 2012, Valeant Pharmaceuticals purchased the SS product line from J&J.

judge reserved decision on J&J and JJCI's motion for summary judgment on plaintiffs' punitive damage claims.

The judge also conducted a Rule 104 hearing on a motion by J&J, JJCI, Imerys, and Cyprus Amax to bar evidence and testimony by plaintiffs' expert William Longo, Ph.D., regarding the testing of certain samples of JBP and SS taken from "vintage" containers. They argued that Longo's testimony should be barred because there was no reliable chain of possession of the samples tested, and no proof the contents of the containers had not been contaminated after they were released by J&J. The judge denied the motion.

In addition, J&J, JJCI, Imerys, and Cyprus Amax filed a motion to preclude plaintiffs' expert James S. Webber, Ph.D., from testifying that non-asbestiform cleavage fragments of certain minerals can cause mesothelioma. Alternatively, they sought a Rule 104 hearing on Webber's qualifications. The judge denied the motion.

During the trial, J&J, JJCI, Imerys, and Cyprus Amax moved to bar plaintiffs' expert, Jacqueline Moline, M.D., from testifying that non-asbestiform cleavage fragments of certain minerals can cause mesothelioma. The judge limited the scope of Moline's testimony, but allowed her to testify regarding "non-asbestiform cleavage fragments from a medical point of view."

A-5711-17

Furthermore, as the evidentiary portion of the trial was coming to an end, plaintiffs asked the judge to impose sanctions upon Imerys based on its failure to produce certain talc samples and test data in discovery and its destruction of certain talc samples. The judge decided to strike Imerys' answer and suppress its defenses. The judge reconsidered that decision and decided to provide the jury with an adverse inference instruction as a sanction for Imerys' discovery violations and spoliation of evidence.

J&J and JJCI then moved to sever the claims against them and sought a mistrial. The judge denied the motions. The judge thereafter granted motions by J&J and Cyprus Amax for dismissal of the claims against them, leaving JJCI and Imerys as the only defendants remaining in the case.

In her final instructions to the jury, the judge provided the jury with the adverse inference instruction, stating, among other things, that Imerys wrongfully withheld talc samples and testing data and destroyed or discarded some talc samples. The judge told the jury it could "infer that the missing evidence may have been helpful to the plaintiffs' case to the detriment of Imerys." The judge instructed the jury that JJCI was not involved in the wrongful conduct.

The jury returned a verdict against JJCI and Imerys finding that Mr. Lanzo

A-5711-17

had been exposed to asbestos from JPB, SS, or both of these products, and that such exposure was a substantial factor in causing his mesothelioma. The jury awarded Mr. Lanzo $30 million in compensatory damages for his disability, impairment, loss of the enjoyment of life, and pain and suffering, and $7 million to Ms. Lanzo for the loss of Mr. Lanzo's services, society, and consortium. The jury assigned seventy percent responsibility for the compensatory damage awards to JJCI and thirty percent to Imerys.

The judge then denied JJCI and Imerys' motions to dismiss the punitive damage claims. After evidence was presented on these claims, the jury awarded plaintiffs punitive damages of $55 million against JJCI and $25 million against Imerys. On April 23, 2018, the judge entered a final judgment in accordance with the jury's verdict, which included pre-judgment interest on the compensatory damages. Thereafter, the judge denied JJCI and Imerys' motions for judgment notwithstanding the verdict, a new trial, or remittitur. These appeals followed.

On appeal, JJCI argues: (1) the trial court erred by admitting unreliable expert testimony; (2) the court undermined its defense by refusing to grant separate trials after ruling that it would provide the jury with an adverse inference instruction regarding Imerys; (3) the jury instructions improperly

7

constrained consideration of potential alternative causes for Mr. Lanzo's illness; and (4) there was insufficient evidence to support the jury's verdict that Mr. Lanzo was exposed to asbestos from J&J talcum powder, establish causation, and support the punitive damages award.

In its appeal, Imerys argues: (1) the court erred by allowing plaintiffs to present unreliable expert testimony from Longo, Webber, and Moline; (2) the adverse inference instruction was unjustified and prejudicial; and (3) the punitive damage award must be vacated.

II.

We briefly summarize the testimony and evidence presented at trial that is pertinent to the issues raised on appeal.

A. Use of Talc in JBP.

Talc is a soft material that has long been used in numerous products, including pharmaceuticals and cosmetics. In the late 19th century, J&J determined that talcum powder could be used to soothe skin irritation, including diaper rash. J&J created JBP, which first appeared in 1894 and, according to

J&J, became a household staple. JBP consists of more than ninety-nine percent talc and a small amount of fragrance.

From 1946 to 1967, J&J acquired talc for JBP from a mine in Italy. In 1966, J&J purchased talc mines in Vermont and formed Windsor Minerals, Inc. (Windsor) to manage the mines. From 1967 to 2003, the Vermont mines provided talc that J&J used in JBP; however, for a brief period in 1980, J&J used Italian talc due to a workers' strike in Vermont.

In 1989, J&J sold Windsor and the Vermont mines to a Cyprus-related entity, and J&J agreed to purchase talc for JBP exclusively from the Cyprus companies. In the 1990s, Cyprus sold its talc business to another entity. Imerys acquired the business in 2011. Since 2003, the talc used in JBP has come from a mine in Guangxi, China.

B. Testing of J&J's Talc Products.

In 1971, two scientists, Dr. Seymour Lewin and Dr. Arthur Langer, reported that they had tested certain talc samples, including J&J powder, and found possible asbestos. J&J sent Dr. Lewin's test samples for testing by the Colorado School of Mines Research Institute, Walter C. McCrone Associates, Inc. (McCrone), Cardiff University, and Princeton University. The labs found no chrysotile asbestos, which Dr. Lewin had detected in the samples. McCrone

A-5711-17

found "a few tremolite rods" in each sample and reported that the samples were "substantially free of asbestiform minerals."

J&J reported the results to the United States Food and Drug Administration (FDA), which conducted its own investigation. According to JJCI, the FDA found no contamination. Dr. Lewin thereafter stated publicly that he found no asbestos contamination in nine of eleven JBP samples, and found the tests of the other two samples were inconclusive. Langer said it was "absolutely untrue" that JBP contained five to twenty-five percent of asbestos fibers, as previously reported. He stated that a "further, more detailed analysis found only "trace" amounts of asbestos in JBP."

The cosmetics industry then developed a testing regimen for asbestos, called the J4-1 method. The first step in that process is use of X-ray diffraction (XRD) to determine if the sample contained minerals that could be asbestos. If XRD detected such minerals, polarized light microscopy (PLM) would be used to see if they were fibrous. If XRD produced negative results, no further testing would be done. Other test methods, such as transmission electron microscopy (TEM), were more sensitive.

J&J adopted a testing regimen it claims exceeded the J4-1 standard. J&J used TEM testing and required its suppliers to do the same. J&J also took other

10

steps to ensure the talc products it sold were not contaminated with asbestos, including hiring laboratories such as McCrone to test talc samples using TEM. J&J also conducted its own tests and audited talc samples. Imerys took talc samples every few hours at the Vermont mines. J&J asserts that since the early 1970s, tens of thousands of talc samples were tested and showed no contamination.

C. Regulation of Asbestos by the United States Occupational Safety and Health Administration (OSHA).

Patrick Joseph Downey, who was designated as the corporate representative for Cyprus Amax and Imerys at trial, testified that in June 1972, OSHA adopted regulations that defined asbestos as including chrysotile, amosite, crocidolite, tremolite, anthophyllite, and actinolite. He said that in June 1992, OSHA amended its regulations and removed non-asbestiform actinolite, tremolite, and anthophyllite from the safety standard. OSHA found "substantial evidence [was] lacking to conclude that non[-]asbestiform tremolite, anthophyllite and actinolite present[ed] the same type or magnitude of health effect as asbestos."

OSHA noted, however, that the National Institute for Occupational Safety and Health (NIOSH) had recommended that OSHA continue to regulate non-asbestiform actinolite, tremolite, and anthophyllite under asbestos standards.

11

According to NIOSH, "cleavage fragments of the appropriate aspect ratio and length from the non[-]asbestiform minerals should be considered as hazardous as fibers from asbestos minerals."[2]

D. Imerys' Testing of Talc Samples.

Julie Pier, Imerys' corporate representative, testified about the company's tests of talc ore from the Vermont mines and the testing of Italian and Chinese talc. She noted that there are different types of test methodologies which are used to analyze the asbestos content in talc, specifically, TEM, XRD, selected-area electron diffraction (SAED), scanning electron microscopy (SEM), and PLM.

Pier stated that Imerys used a definition of asbestos that was based on a methodology used by the United States Environmental Protection Agency (EPA). She explained the first step in determining if a particle is asbestiform is to determine if it was formed in an asbestos "habit." The particle also must display at least two additional features, which include: parallel fibers that occur in bundles; bundles that have splayed ends; and fibers that show curvature and flexibility.

_____

[2] An aspect ratio is "the length of a particle divided by its width."

Pier said cleavage fragments of minerals and asbestiform minerals are completely different. She noted that tremolite is very different from tremolite asbestos. According to Pier, tremolite, actinolite, and anthophyllite are most often non-asbestiform minerals. Pier also said that under the EPA's definition, a fiber with an aspect ratio of less than twenty-to-one should not be considered asbestos. She stated that certain professional organizations, including the American Society for Testing and Materials (ASTM) and the International Organization for Standardization (ISO), "have determined that the asbestiform habit is what defines asbestos."

Pier further testified that from 1989 to the time of trial, Imerys used XRD, PLM, SEM, and TEM for testing talc samples. She acknowledged that some fine particles in talc products might not be visible with PLM. She stated, however, that if asbestos were present in a sample, it can be identified by PLM because "whenever asbestos is present there are always particles large enough . . . to see by PLM."

Pier asserted that Imerys had been doing TEM testing the entire time it had been selling talc to J&J. She stated that TEM testing "only gives part of the picture" and, therefore, it is always used "in combination with other microscopy

13

techniques." She said TEM can identify the type of mineral but cannot always identify whether the mineral is or is not asbestos.

Pier reviewed results of tests of Italian and Vermont talc samples from 1983 to 2001. She stated that no asbestiform minerals had been detected in the hundreds of samples tested. She asserted that between 1989 and 2003, more than 500 TEM analyses were performed, and there were no findings of asbestos that exceeded background amounts. She further testified that no asbestos had been found in tests of talc from the mine in Guangxi, China, which used TEM, XRD and PLM for testing.

Pier also acknowledged that if a bundle of fibers was found using TEM, the bundle would not be considered to be a cleavage fragment. She stated that PLM could not detect individual chrysotile fibers. She added, however, that chrysotile fibers "occur[ring] with talc [would] be in bundle form, so there should be some big particles."

E. Longo's Testimony.

The judge qualified Longo to testify as an "expert in the field of testing, testing for asbestos, and exposure to asbestos from [an] industrial hygiene perspective." He stated that asbestos had been found in JBP, and that Mr. Lanzo had been exposed to asbestos from his use of JBP. He said that the results of

14

J&J's and Imerys' testing did not mean there was no asbestos in J&J's talc products.

Longo testified that TEM was the preferred method for asbestos testing because TEM can reveal particles that are not visible with PLM. He stated that TEM is "the only tool that can see the thinnest fibers," which are thousands of times thinner than a human hair. He stated that TEM and SEM were available in the 1970s and that in an internal memorandum, dated January 3, 1974, J&J had acknowledged TEM was "the only absolute proof with electron diffraction for identification of asbestos in talc." He opined that in the 1970s or 1980s, it was not appropriate to use only XRD to test for the presence of asbestos in talc.

Longo further testified that thirty-two samples of J&J's talc products, which were in "vintage" containers provided to him, had been tested under his supervision and asbestos was found in eighteen of the samples. He noted that when he received the containers, some were missing the ring of plastic around the top. He assumed they "had been opened, or at least the wrapping around the container top had been opened."

Longo considered the condition of the packaging in determining whether the samples could have been contaminated. He said none of the containers showed any signs of tampering. He noted that the container caps could not be

15

removed by hand. They could be removed with a screwdriver; however, that would damage the caps and leave microscopic traces on the container. He said there was no damage to the caps indicating the caps had been removed previously.

Longo also opined that it was not possible for the samples to have been contaminated unintentionally. He explained for that to happen, asbestos would have to drift into the small openings in the cap and then reach a level of contamination. He said the chance of that happening was "highly improbable." He also said he had performed a particle-size-distribution analysis, which supported the conclusion that the original contents of the bottles had not been replaced with another product. He testified that the samples tested had the appearance, substance, and internal patterns consistent with JBP.

Longo went on to testify that tremolite asbestos had been found in the samples tested using TEM, and the findings ranged from 1 to 104 fibers. He said anthophyllite asbestos also had been found in one of the samples. Longo stated that most of the structures detected were bundles. He testified that the amphibole asbestos found in the samples met "the definition for an asbestos regulated fiber."

A-5711-17

Longo further testified that the asbestos particles found in the tests were not cleavage fragments. He said a bundle of fibers cannot be a cleavage fragment and bundles are asbestiform by their nature. He noted that some persons say single fibers look like cleavage fragments. He testified, however, that "[t]ypically a cleavage fragment that is not asbestiform big enough to be a fiber has sort of a blocky kind of look."

Longo compared his results to a National Institute of Standards and Technology (NIST) reference sample for tremolite asbestos and the results matched. He also compared the aspect ratios of the particles found in his testing to NIST standards and the results reported by A.M. Blount.[3] He said they were consistent with his results. Longo claimed that one could "only conclude" that he found tremolite asbestos in the samples of JBP that were tested.

Longo opined that Mr. Lanzo had been "exposed to significant amounts of amphibole asbestos" from JBP and SS. He noted the presence of talc and asbestos in Mr. Lanzo's lymph tissue, which he said, "match[ed] what you would expect from the exposure from talc." He testified that the talc particles,

---

[3] Blount's study was published in 1991 in the "Environmental Health Perspectives" journal. Blount reported the presence of asbestos in a sample of JBP.

A-5711-17

tremolite, and anthophyllite were consistent with the products Mr. Lanzo had been using.

On cross-examination, Longo agreed he was not an expert in causation of mesothelioma, and said he was not offering any opinions on the health effects of asbestos. On redirect, Longo stated that if Mr. Lanzo had used JBP as he had described, it would result in substantial exposure to asbestos fibers.

F. Webber's Testimony.

Webber testified for plaintiffs "as an expert in the fields [of] environmental health, including methods and methods development of asbestos in the environment and asbestos in talc." According to Webber, there is a "commercial/mineralogical" definition for asbestos that is used to determine whether a substance is useful in commercial applications, and a "public health definition" used in laboratory analyses to determine if a substance is harmful.

Webber stated the commercial definition applied to asbestos with long silky fibers that have aspect ratios greater than 20-1 and up to 100-1 "or even longer." He said asbestos with a high aspect ratio was important commercially

because the fibers could be woven. He stated that very good grades of asbestos also have high tensile strength, flexibility, durability, and chemical resistance.[4]

Webber noted that in 1972, when the federal government began to regulate asbestos, several types of asbestos were being used commercially. He stated that chrysotile, the only serpentine fiber asbestos, "accounted for 95 percent of [commercial] production and use in the United States." The other five types of asbestos were all amphiboles, specifically, amosite, crocidolite, anthophyllite, tremolite, and actinolite.

Webber testified, however, that in the field of public health, the concern is not whether the fiber populations have commercially valuable characteristics but, rather, whether individual fibers can get into the lungs. According to Webber, "particle dimensions [and] fiber sizes are critical in determining whether they're going to have the potential to reach the lungs and therefore, cause disease." He said the aerodynamic diameter of asbestos "is determined

---

[4] "Tensile strength" is "the greatest longitudinal stress a substance can bear without tearing apart." Merriam-Webster's Collegiate Dictionary 1288 (11th ed. 2014).

A-5711-17

almost entirely by its width" and particles of asbestos that are thinner than one micrometer will reach the alveoli of the lungs.[5]

Webber explained that typically, white blood cells can remove particles that are small enough to reach the alveoli. He stated, however, that because asbestos fibers are usually longer than a white blood cell, the fibers cannot be engulfed and removed. Webber said many asbestos fibers "remain in the lungs and because they're durable silicate minerals, they're there for life." He stated that the presence of asbestos in the lungs and its durability "can create conditions that promote cancer," and that "mesothelioma is considered a fingerprint of asbestos or mineral fiber exposure."

Webber further testified that when an amphibole rock is cracked, three possible types of particles can break off. The first type is a chunk like the original rock and it would not have a health impact. The second type is an asbestiform particle that has the properties of commercially-valuable asbestos. The third is a cleavage fragment that may be as long and thin as an asbestiform fiber but "may not have been formed under the same conditions that produced the asbestiform fiber." He said that cleavage fragments can have the right

---

[5] The alveoli are "small air-containing compartment[s] of the lungs . . . from which respiratory gases are exchanged with the pulmonary capillaries." Merriam-Webster's Collegiate Dictionary 37.

aerodynamic diameter to reach the lungs. They do not have the tensile strength or flexibility of commercial asbestos.

Webber opined that it does not matter whether a fiber is asbestiform or non-asbestiform because "[i]f it has the right morphological characteristics and mineralogical and chemical characteristics, it has the potential to cause disease." He testified that cleavage fragments and asbestiform fibers with identical aerodynamic diameters have the same potential to reach the alveoli.

Webber said if the fibers are long enough to avoid removal by white blood cells, "they both have the same potential for inducing disease." He stated that there have been no studies demonstrating that "thin cleavage fragments . . . are less hazardous than asbestiform fibers of the same dimensions."

Webber also discussed many of the same reports of testing that were cited by plaintiffs' other witnesses. He opined, based on the test results he reviewed, that between 1972 and 2003, JBP and SS contained asbestos. He stated that certain tests failed to detect asbestos in talc because the testing methods used did not ensure there was no asbestos in talc. He stated that many tests failed to detect asbestos because "the talc industry chose methods that lacked sensitivity to detect asbestos in the talc."

21

G.  Moline's Testimony.

Moline testified that "[v]irtually all cases of mesothelioma in the United States are caused by asbestos exposure."  She said asbestos-related diseases typically take decades to develop and not all individuals exposed to asbestos become ill.  She noted that asbestos fibers are microscopic, and individuals can be exposed to asbestos by using, or being near someone who is using a product that contains asbestos.  Moreover, because asbestos can remain in the air, people can be exposed after the usage occurs.

Moline did not attempt to quantify Mr. Lanzo's exposure to asbestos from JBP and SS.  She stated that it was unnecessary to do so to opine that his exposure was a significant contributing factor to his mesothelioma.  She testified that no one would have been measuring the asbestos in the air when Mr. Lanzo was using JBP or SS.  According to Moline, it was rare to have numerical values in an individual exposure case and it was not considered necessary.

Moline testified that the key question is whether an individual was exposed to asbestos because the medical literature has firmly established that asbestos causes mesothelioma.  She explained that asbestos is present in about 3000 different products and physicians regularly ascribe the cause of

22

mesothelioma to exposure to a product without epidemiological studies of the particular product.

Moline testified that EPA Region 9 had stated that, from a public health perspective, there was no distinction between fibers and cleavage fragments with the same size, shape, and chemical composition.[6] She said "[t]he body [cannot] differentiate between the two [and] from a human health or a medical standpoint, there's no difference in terms of their ability to cause disease."

Moline asserted this was generally accepted in the medical literature. She also stated that there was published literature showing that non-asbestiform amphiboles cause mesothelioma. She said studies had been made of groups exposed to non-asbestiform minerals, which showed elevated rates of mesothelioma.

H. Testimony by Matthew Spencer Sanchez.

Sanchez testified as defendants' expert witness in "geology, mineralogy, microscopy, identification of serpentine and amphibole minerals, including

_____

[6] In 2006, EPA Region 9 issued a response to a report prepared by RJ Lee Group, Inc., which criticized RJ Lee for applying "a [g]eologic [d]efinition rather than a [p]ublic [h]ealth [d]efinition to [c]haracterize [m]icroscopic [s]tructures." (2006 EPA Region 9 Response or Response). Among other things, the agency stated that it "makes no distinction between fibers and cleavage fragments of comparable chemical composition, size, and shape."

asbestos, and related testing methodologies and equipment." He stated that J&J talc products do not contain asbestos.

Sanchez said there are more than seventy-five types of amphiboles, which are "ubiquitous in rocks" and "very common." He stated, however, that amphibole asbestos is rare, and comprises less than one percent of amphiboles. He noted that asbestos forms when there are fractures in the rocks and asbestos "forms as individual fibers all next to each other." He explained this gives asbestos high tensile strength and flexibility.

Sanchez said the talc J&J used for JBP came from mines in Vermont, Italy, and China, and the pressures and temperatures that formed the talc deposits "were not conducive to the formation of asbestiform minerals." He said a study of the rock samples from the Vermont mine examined the samples using PLM, XRD, and TEM and found no asbestos. The study found some non-asbestiform amphiboles "in discreet locations" but they were not "disseminated throughout the talc ore."

Sanchez also noted that a 1977 study commissioned by NIOSH examined 100 samples from talc mines throughout the United States for the presence of asbestos. PLM, XRD, and TEM were used to test the samples. The test of J&J's

Vermont-sourced talc detected no chrysotile or anthophyllite but found some non-asbestiform tremolite and actinolite.

Sanchez asserted that there was no single tool for use to determine if a particular particle was asbestos. He said the best approach is to use both TEM and PLM to confirm the results found by each. He stated that if talcum powder was contaminated with asbestos, it would be detected by PLM because it would be present "in all size fractions" and you would "see big pieces of it."

He testified that when an amphibole is crushed it can create "somewhat elongated fragments" that are "referred to very generically as cleavage fragment[s]." He said the term "cleavage fragment" was "used to denote something that is not asbestos."

He stated that although asbestos fibers are all "relatively the same width," the particles in a cleavage fragment population have "a much wider distribution of the widths of the individual particles." He explained that, "as a general rule, as [cleavage fragments] get shorter they all get thinner." He said that cleavage fragments could have "linear features" and that there was a "misconception" that a linear feature in a particle defined it as a bundle.

Sanchez asserted that "just the nature of an elongated particle has nothing to do with whether it's asbestos or not," and that there is "no way to know" where

25

a single fiber "came from in and of itself." Other techniques should be added when a single fiber is detected by TEM to look at the "population characteristics of those individual fibers . . . to determine what it would have come from." He said, "PLM data complimentary to the TEM data can inform you whether what you're seeing is, in fact, asbestiform or not."

Sanchez stated that, he had reviewed hundreds of documents related to the testing of talc ore and talc used in JBP. He said there was no evidence J&J cosmetic talc products were contaminated with asbestos. He noted that in 1983, the United States Geological Survey (USGS) had concurred in a determination by EMV Associates, Inc. that several J&J talc samples did not contain asbestos.

He also noted that in 1983, the FDA had issued a letter indicating that in the 1960s and 1970s, some cosmetic talc products contained asbestiform minerals. The FDA stated, however, that it considered the analytical results "of questionable reliability." The FDA concluded there was no "health hazard attributable to asbestos in cosmetic talc" and no need for a warning label.

Sanchez criticized Longo's analysis of the vintage JBP samples. He stated that Longo's analysis inappropriately combined data across different samples, and that Longo's data was consistent with non-asbestiform amphiboles. He noted that Longo had found non-asbestiform amphiboles in a few samples, but

26

stated that on occasion, this is what you would "expect from the geology of th[e]se deposits . . . ." He said Longo's testing confirmed his conclusion that there were non-asbestiform amphiboles in some of the talc deposits.

Sanchez also commented on the "tissue digestion grids" prepared by Ronald E. Gordon, who testified for plaintiffs as an expert in "tissue digestion analysis for asbestos and other particulates in human tissue." Gordon found three tremolite asbestos fibers and two anthophyllite asbestos fibers in Mr. Lanzo's lymph nodes, and he identified the fibers as asbestos, based on their lengths, aspect ratios, and "diffraction" patterns. Gordon also found talc in Mr. Lanzo's tissues.

Sanchez stated that he was unable to identify any of the particles that Gordon had identified. However, Sanchez identified three elongated particles that Gordon had not reported.

The first was a tremolite fiber, but Sanchez could not definitively state whether it was asbestiform. The second particle was a talc anthophyllite "transitional particle" but such particles are not asbestos. The third particle was a crocidolite fiber. Sanchez noted that crocidolite is a commercial form of asbestos mined in South Africa, Bolivia, and Australia. He said that it has never "been associated as a contaminant of cosmetic talc."

27

On cross-examination, Sanchez admitted that the crocidolite particle he identified was single fiber. He acknowledged that if there was a single particle whose chemistry was consistent with crocidolite, it could also be riebeckite, the non-asbestiform version of the mineral. He noted that a population of fibers consistent with crocidolite had not been found in Mr. Lanzo's tissue.

On redirect, Sanchez testified he was confident the fiber he identified as crocidolite was not the non-asbestiform version riebeckite. He said riebeckite is a "very uncommon amphibole." Sanchez stated he did not believe contamination from his lab could explain the presence of the crocidolite fiber in the grids he had examined.

## III.

JJCI's and Imerys' primary argument is that the trial court erred by admitting expert testimony from Webber and Moline. Defendants assert that by allowing the two experts to testify that non-asbestiform minerals which are similar in size to asbestiform minerals can cause mesothelioma, the trial court misapplied the well-established judicial gatekeeping procedures our Supreme Court "reinforce[d]" in In re Accutane Litigation (Accutane), 234 N.J. 340, 388 (2018).

Specifically, JJCI and Imerys contend both experts failed to: (1) explain what causes the human body to respond in the same way to the different mineral forms; (2) acknowledge the contrary opinions of scientists and government agencies; (3) provide evidentiary support for their opinion that non-asbestiform minerals can cause mesothelioma; and (4) produce evidence that their theory that non-asbestiform minerals are harmful had been subject to peer-review and publication or was generally accepted in the scientific community. They argue that the court's decision to deny their motion to bar this testimony was clearly capable of producing an unjust result and, accordingly, new trials are warranted.

Having considered JJCI and Imerys' contentions in light of the record and the applicable law, we agree the trial court mistakenly exercised its discretion by denying their motions and this error was not harmless under the circumstances presented in this case. Therefore, we reverse and remand for new trials for both defendants.

A. Accutane and the Trial Court's Role as Gatekeeper for Expert Testimony.

We begin by noting that the Supreme Court's decision in Accutane is applicable here even though that decision was issued approximately two months after the conclusion of the trial. In civil cases, "judicial decisions are presumed

to apply retroactively." In re Contest of Nov. 8, 2011 Gen. Election of Off. of N.J. Gen. Assembly, 210 N.J. 29, 68 (2012) (citing Fischer v. Canario, 143 N.J. 235, 243 (1996)). To avoid that presumption, a party must show the decision established a new principle "either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed." Coons v. Am. Honda Motor Co., 96 N.J. 419, 427 (1984) (quoting Chevron Oil Co. v. Huson, 404 U.S. 97, 106 (1971)).

Accutane did not alter N.J.R.E. 702 or 703, nor would its holding "produce substantial inequitable results if applied retroactively." Ibid. (quoting Chevron Oil Co., 404 U.S. at 107). Instead, in reaching its decision, the Supreme Court "perceive[d] little distinction between Daubert's[7] principles regarding expert testimony and our own, and believe[d] that its factors for assessing the reliability of expert testimony will aid our trial courts in their role as the gatekeeper of scientific expert testimony in civil cases." Accutane, 234 N.J. at 347-48. The Court "reconcile[d] our standard under N.J.R.E. 702, and relatedly N.J.R.E. 703, with the federal Daubert standard to incorporate its factors for civil cases." Id.

---

7  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

at 348. Indeed, none of the parties argue otherwise. Accordingly, we are satisfied that Accutane sets forth the standards that govern our review.

As set forth in Accutane, an expert's opinion on causation may be admitted when "based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field." Id. at 349-50 (quoting Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449 (1991)). In cases "involving novel theories of causation," a court must review the "data and studies relied on by experts proffering an opinion in order to 'determine whether the expert's opinion is derived from a sound and well-founded methodology that is supported by some expert consensus in the appropriate field.'" Id. at 350 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

A court must also "assess the soundness of the proffered methodology and the qualifications of the expert." Rubanick, 125 N.J. at 454. The focus must be "solely on principles and methodology, not on the conclusions that they generate." Kemp ex rel. Wright v. State, 174 N.J. 412, 426 (2002) (quoting Daubert, 509 U.S. at 595).

In Accutane, the Court took the opportunity to "clarify and reinforce the proper role for the trial court as the gatekeeper of expert witness testimony."

31

234 N.J. at 388. The Court explained that when it adopted the more relaxed approach for expert testimony, "it envisioned the trial court's function as that of a gatekeeper – deciding what is reliable enough to be admitted and what is to be excluded. Those are not credibility determinations that are the province of the jury, but rather legal determinations about the reliability of the expert's methodology." Ibid.

In performing that function, "the trial court is responsible for advancing the truth-seeking function of our system of justice, while still allowing for new or developing opinions on medical causation that may not yet have gained general acceptance." Id. at 389. In essence, "[t]he trial court is the spigot that allows novel expert testimony in areas of evolving medical causation science, provided the proponent of the expert can demonstrate that the expert adheres to scientific norms in distinct ways that we have identified." Ibid.

This "gatekeeping role requires care." Ibid. The Court emphasized that the trial court "must ensure compliance with the requirement of 'some expert consensus that the methodology and the underlying data are generally followed by experts in the field,'" ibid. (quoting Rubanick, 125 N.J. at 450), "distinguish scientifically sound reasoning from that of the self-validating expert," Landrigan, 127 N.J. at 414, and disallow "unsubstantiated personal beliefs."

Kemp, 174 N.J. at 427.  "Properly exercised, the gatekeeping function prevents the jury's exposure to unsound science through the compelling voice of an expert."  Accutane, 234 N.J. at 389.

The Court emphasized that it expects trial courts "to assess both the methodology used by the expert to arrive at an opinion and the underlying data used in the formation of the opinion" to "ensure that the expert is adhering to norms accepted by fellow members of the pertinent scientific community."  Id. at 396-97.  In short, "[m]ethodology, in all its parts, is the focus of the reliability assessment, not outcome."  Id. at 397.  "It is not for a trial court to bless new 'inspired' science theory; the goal is to permit the jury to hear reliable science to support the expert opinion."  Ibid.; cf. Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319 (7th Cir. 1996) (observing that "the courtroom is not the place for scientific guesswork, even of the inspired sort").

The Court therefore concluded that New Jersey law and Daubert were "aligned in their general approach to a methodology-based test for reliability. Both ask whether an expert's reasoning or methodology underlying the testimony is scientifically valid."  Accutane, 234 N.J. at 397 (citing Daubert, 509 U.S. at 594-95; Rubanick, 125 N.J. at 449).  "[B]oth standards look to whether that reasoning or methodology properly can be applied to facts in issue."

33

Ibid. The Court, thus, "[d]istilled" the Daubert factors into the following "general factors":

> 1) Whether the scientific theory can be, or at any time has been, tested;
>
> 2) Whether the scientific theory has been subjected to peer review and publication, noting that publication is one form of peer review but is not a "sine qua non";
>
> 3) Whether there is any known or potential rate of error and whether there exist any standards for maintaining or controlling the technique's operation; and
>
> 4) Whether there does exist a general acceptance in the scientific community about the scientific theory.
>
> [Id. at 398.]

These factors, according to the Court, "dovetail with the overall goals of our evidential standard and . . . provide a helpful – but not necessary or definitive – guide for our courts to consider when performing their gatekeeper role concerning the admission of expert testimony." Id. at 398-99.

The Court concluded that its "view of proper gatekeeping in a methodology-based approach to reliability for expert scientific testimony requires the proponent to demonstrate that the expert applies . . . scientifically recognized methodology in the way that others in the field practice the methodology." Id. at 399-400. When a proponent fails to demonstrate "the

34

soundness of a methodology, both in terms of its approach to reasoning and to its use of data, from the perspective of others within the relevant scientific community, the gatekeeper should exclude the proposed expert testimony on the basis that it is unreliable." Id. at 400.

B.  Admission of Expert Testimony by Webber and Moline.

In this case, JJCI filed motions to bar Webber and Moline from testifying that non-asbestiform cleavage fragments can cause mesothelioma.  Imerys joined in both motions.  The trial court did not conduct a Rule 104 hearing to perform the analysis required by Accutane and the prior decisions upon which it is based.  The court also did not assess the methodology, or the underlying data used by the two experts to form their opinions.

Instead, in deciding to admit Webber's proposed testimony, the court merely stated that "[t]he issue of cleavage fragments [was] an area that's highly contested between plaintiff[s'] experts and defense experts."  The court's ruling denying defendants' motion to exclude Moline's testimony was equally brief.  It simply noted that "the definition of asbestos, the asbestiform versus the non-asbestiform habit" was "one of the central issues in these talc cases . . . ."

As required by Accutane, we apply an abuse of discretion standard of review when "assessing whether a trial court has properly admitted or excluded

35

expert scientific testimony in a civil case."  234 N.J. at 348.  The trial court's ruling should be reversed "only if it 'was so wide off the mark that a manifest denial of justice resulted.'"  Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).  Any error deemed harmless should be disregarded.  Velazquez v. City of Camden, 447 N.J. Super. 224, 232 (App. Div. 2016).  "Only those errors 'clearly capable of producing an unjust result,' will result in a reversal of a jury verdict.'"  Ibid. (quoting R. 2:10-2).[8]

1. Webber's Testimony.

Webber opined that cleavage fragments had the same potential to cause disease as asbestiform fibers with like aerodynamic dimensions.  However, he testified at trial that he had not conducted, nor was he aware of, any studies showing that non-asbestiform cleavage fragments can cause mesothelioma.  He also had not published anything stating that opinion.  Although in his report he

_____

[8] Plaintiffs argue that a plain error standard of review should apply to Webber's testimony based upon their claim that defendants only challenged that expert's qualifications and not his opinions.  See State v. Gore, 205 N.J. 363, 382-83 (2011) (plain error standard applies when no objection is raised at trial).  However, the record does not support plaintiffs' contention that defendants failed to challenge Webber's opinion that non-asbestiform minerals can cause mesothelioma.  In its brief seeking to bar this testimony, JJCI specifically argued there was no scientific evidence to support Webber's opinion, and Imerys joined in JJCI's motion.

stated that "[o]nce in the lungs, cleavage fragments almost certainly present the same risk as asbestos fibers of the same dimension because of their identical chemical composition and their biodurability," he provided no citations to any authority in support of that statement.

At trial, Webber relied on four authorities in support of his opinion. Webber first cited a published study by a pathologist, Victor Roggli, which found that "tremolite and other non-commercial amphibole fibers [were] present in the lungs of a substantial proportion of patients with mesothelioma" and that the "fibers appear[ed] to be the likely cause of the disease." However, because the study did not discriminate between asbestiform and non-asbestiform fibers, it did not support the conclusion that non-asbestiform tremolite causes mesothelioma, as Webber claimed.

The second publication Webber cited was titled "Differentiating Non-Asbestiform Amphibole and Amphibole Asbestos by Size Characteristics" published in the December 2008, Journal of Occupational and Environmental Hygiene and co-authored by Dr. Martin Harper, who was associated with NIOSH (2008 Harper article). The article baldly stated that NIOSH did not currently believe there was "sufficient evidence for a different toxicity for non-asbestiform amphibole particles that meet the morphological criteria for a fiber."

37

Webber simply quoted this statement from the article and asserted that it supported his opinion, but he did not identify or explain any scientific evidence that formed the basis for the statement.

Moreover, NIOSH clarified its position in April 2011 when it published Current Intelligence Bulletin 62, titled "Asbestos Fibers and Other Elongate Mineral Particles: State of the Science and Roadmap for Research" (2011 Roadmap). In that publication, NIOSH stated that its inclusion of non-asbestiform minerals in the definition of airborne asbestos fibers had been "based on inconclusive science." The agency commented that:

> Epidemiological evidence clearly indicates a causal relationship between exposure to fibers from the asbestos minerals and various adverse health outcomes, including asbestosis, lung cancer, and mesothelioma. However, NIOSH has viewed as inconclusive the results from epidemiological studies of workers exposed to EMPs[9] from the non[-]asbestiform analogs of the asbestos minerals.

[(Emphasis added).]

Webber also referred to an article written by Gregory Meeker from the USGS that was published in October 2009 (2009 Meeker article). Meeker wrote that "using the term 'asbestiform' to differentiate a hazardous from a non-

---

9 "EMPs" are "elongate mineral particles."

hazardous substance has no foundational basis in the medical sciences." However, the article did not report the results of a scientific study and was not peer-reviewed. In addition, Meeker stated that "[t]oxicological evidence comparing human and animal health effects of asbestiform and non-asbestiform minerals is based primarily on particle size and shape and remains controversial."

The final publication that Webber relied upon was the 2006 EPA Region 9 Response, which stated that "[f]or the purposes of public health assessment and protection, [the] EPA makes no distinction between fibers and cleavage fragments of comparable chemical composition, size, and shape." However, in the publication, the EPA provided no details of any studies underlying its assessment, and Webber did not discuss any such details in his testimony.

In Accutane, the Court stressed the importance of the trial court's gatekeeping role in assessing the reasonableness of the methodology and underlying data used in forming an expert's opinion. 234 N.J. at 399-400. Here, Webber did not identify any data underlying his opinion. Further, he did not demonstrate that any of the authorities he relied on would be reasonably relied on by other experts in his field to reach an opinion regarding causation. Id. at 400; Rubanick, 125 N.J. at 451.

39

As we noted, the Roggli study made no attempt to discern whether non-asbestiform tremolite caused mesothelioma. The 2008 Harper article stated that there was insufficient evidence that toxicity differed between asbestiform and non-asbestiform particles, but that statement alone does not provide evidence that non-asbestiform particles can cause mesothelioma.

In addition, the 2009 Meeker article stated that toxicological evidence regarding health effects of asbestiform and non-asbestiform particles remained controversial. Nowhere does that article state that non-asbestiform minerals can cause mesothelioma. Finally, the 2006 EPA Region 9 Response stated that the EPA made no distinction for purposes of public health between asbestiform fibers and cleavage fragments of similar dimensions and chemical compositions, but the Response did not say that exposure to cleavage fragments caused mesothelioma.

Consideration of the Daubert factors does not support admission of Webber's opinion. His opinion has not been tested as he admitted there are no studies demonstrating that non-asbestiform versions of the six regulated asbestos minerals cause mesothelioma. Accutane, 234 N.J. at 398. Nor has that theory been subjected to peer review and publication. Ibid. Moreover, Webber did not show that his theory is generally accepted in the scientific community.

In short, plaintiffs failed to establish that Webber's "methodology involv[ed] data and information of the type reasonably relied on by experts in the scientific field." Rubanick, 125 N.J. at 449. Moreover, the trial court did not assess the methodology, or the underlying data that Webber used to form his opinion. Accutane, 234 N.J. at 396. The court only noted that "[t]he issue of cleavage fragments [was] an area that's highly contested between plaintiff[s'] experts and defense experts."

We are therefore convinced the trial court did not perform its required gatekeeping function and mistakenly exercised its discretion by permitting Webber to testify that non-asbestiform cleavage fragments can cause mesothelioma.

2. Moline's Testimony.

Moline's expert testimony that non-asbestiform minerals can cause mesothelioma suffered from many of the same defects as Webber's opinion on this topic. The trial court once again did not perform the rigorous assessment required by Accutane to determine whether Moline's opinions met the Daubert standards.

Relying on the 2006 EPA Region 9 Response, Moline testified there was no difference between asbestiform fibers and non-asbestiform cleavage

fragments with the same dimensions and chemical composition "in terms of their ability to cause disease." She claimed her view was generally accepted in the medical literature, that there has been published literature showing that non-asbestiform amphiboles cause mesothelioma, and that there have been studies of groups exposed to non-asbestiform minerals that show elevated rates of mesothelioma. Moline did not, however, identify any other specific literature or studies supporting those claims during her testimony.

In her expert report, Moline stated that the EPA, the United States Centers for Disease Control and Prevention (CDC), and the American Thoracic Society had rejected the "notion" that labeling anthophyllite and tremolite as "either 'non-asbestiform' or 'cleavage fragments' . . . has biological significance." She did not, however, cite to specific publications by those authorities except for the 2006 EPA Region 9 Response.

Moline also wrote that "mesotheliomas [had] been documented among New York State miners and millers of talc containing approximately 50% 'non-asbestiform' anthophyllite and tremolite." The source for that statement is not, however, readily apparent in her report. Notably, Moline did not testify regarding any studies conducted or data provided by the American Thoracic

42

Society, CDC, or Roggli, despite plaintiffs' argument that she relied on these authorities.

At trial, defendants confronted Moline with testimony she gave previously in another matter, where she stated she did not "have enough information . . . one way or the other" to opine that non-asbestiform minerals were carcinogenic. In response, Moline claimed that since the time she gave that conflicting opinion, she had "the opportunity to review additional studies and [had] found information that ha[d] shown that there are cases of mesothelioma among individuals that have had those exposures." However, Moline did not identify the studies or information she was relying on and testified that she was "unaware of any studies that have specifically looked at [that] question" of whether "asbestos-related diseases can be caused by the non-asbestiform varieties of the six regulated forms of asbestos."

As was the case with Webber's testimony, the trial court did not assess the methodology or the underlying data that Moline used to form her opinion. Accutane, 234 N.J. at 396. The court's only comment in admitting Moline's testimony over defendants' objection was that "the definition of asbestos, the asbestiform versus the non-asbestiform habit" was "one of the central issues" in the case.

43

Accordingly, we conclude that the trial court erred by failing to perform its required gatekeeping function with regard to Moline's testimony. The court did not conduct a Rule 104 hearing to test her theory and conducted no analysis as to whether the Daubert factors had been met. Accutane, 234 N.J. at 398. Thus, the court erred by allowing Moline to testify that there was no difference between asbestiform fibers and non-asbestiform cleavage fragments with the same dimensions and chemical composition "in terms of their ability to cause disease."

C. The Admission of The Expert Testimony Was Not Harmless Error.

Having concluded that the trial court erred by allowing Webber and Moline to provide expert testimony that non-asbestiform minerals can cause mesothelioma, we must determine whether the mistaken rulings were "so wide off the mark that a manifest denial of justice resulted." Rodriguez, 237 N.J. at 57 (quoting Griffin, 225 N.J. at 413). Based on our thorough review of the record, we are convinced that the judge's erroneous decisions were "clearly capable of producing an unjust result," and therefore, new trials are required. Velazquez, 447 N.J. Super. at 232 (quoting R. 2:10-2).

Although Webber and Moline testified that non-asbestiform minerals could cause mesothelioma, neither expert opined that non-asbestiform cleavage

fragments were detected in JBP. However, Longo addressed that issue extensively in his testimony concerning the vintage JBP samples.

Longo initially testified that most of the structures he identified in the JBP samples were bundles of fibers, and he denied that any of the structures he found were cleavage fragments. But, on cross-examination, Longo admitted that long, thin cleavage fragments can resemble asbestos fibers, and that TEM, which was the tool he used in his analysis, could not identify a single fiber as asbestiform or non-asbestiform. When questioned about a single tremolite fiber detected in one of the samples, Longo could not say whether it was asbestiform or non-asbestiform.

Defendants' expert Sanchez testified that Longo's findings were "consistent with non-asbestiform amphiboles." He said Longo's analyses showed that non-asbestiform amphiboles had been found in a few of the samples, which is what he would have expected. Before discussing Longo's testing of the vintage samples, Sanchez testified that non-asbestiform tremolite and actinolite had been found in a sample of J&J Vermont talc in a 1977 study commissioned by NIOSH and that the finding was consistent with a study conducted of samples from a Windsor mine. Sanchez further testified that the results of the two studies were consistent with what he would "expect to find in

A-5711-17

[the] geology of that area." Sanchez stated that Longo's work confirmed his conclusion that there were non-asbestiform amphiboles in some of the talc deposits.

Through Sanchez's testimony, defendants admitted there were non-asbestiform amphiboles present in some JBP. If the jury believed Webber's and Moline's testimony that those non-asbestiform minerals could cause mesothelioma, it may have concluded that the asbestiform/non-asbestiform distinction did not matter and that defendants had essentially admitted that some JBP contained cancer-causing amphiboles.

Longo's testimony shows that he made no attempt to distinguish between asbestiform and non-asbestiform amphiboles for the single fibers he detected in the vintage samples. However, he also testified that most of the particles he found were bundles. Sanchez challenged Longo's aspect ratio analysis of the vintage samples but did not specifically challenge Longo's finding of bundles.[10] Sanchez testified that "bundle morphology [was] definitive as to whether or not you have asbestiform amphibole." However, Sanchez also testified generally

---

[10] The court apparently granted an application by plaintiffs to limit Sanchez's testimony regarding Longo's testing of the samples to aspect ratios because Sanchez had "made no disclosure and no criticism" of Longo's work.

that cleavage fragments could have "linear features" and that there was a "misconception" that a linear feature in a particle defined it as a bundle.

Perhaps anticipating that defendants would claim only non-asbestiform amphiboles were present in some of the talc used in JBP, counsel for plaintiffs argued in his opening statement that non-asbestiform fibers could cause asbestos-related disease. Plaintiffs' counsel told the jury that:

> [J&J] got together with other companies that were selling talc and they chose to call the asbestos something else. I guess on the theory that if you don't call it asbestos then it can't cause asbestos-related disease.

> You see, [J&J] and the other talc companies argued that these minerals come in different forms, they grow in the ground in different forms. On the right you see something very fibrous, you see all the fibers. On the left it's rocky, it's chunky and it's non-fibrous. And they argued and they claimed that there is a difference when it comes to . . . the ability to cause disease . . . on whether or not the single fiber that gets into the lungs, that gets into the pleura, that attacks the cells grew up one way or grew up another.

> . . . .

> The defendants will urge everyone to adopt these other definitions. And our experts will tell you it doesn't matter what you call something. The cells of our body don't know the difference about where they grew up, . . . whether they grew up as a fiber or as a rock. It's the same mineral. It's the same chemistry. It's the same dimensions. It causes the same diseases.

. . . .

> [Webber is] going to explain to us that it doesn't matter what you call it, it matters whether or not it can be breathed in and it matters whether or not it can penetrate all the way to where the cancer starts. That's the important thing.
>
> [(Emphasis added).]

Counsel also informed the jury that "[a]sbestiform is the definition that the defendants want to use." In discussing defendants' experts, counsel claimed that "the refrain is always the same. It's not asbestos. It's not asbestos. It's not asbestos. It's not asbestos. We have our own definitions that we apply." Counsel added that "the key is finding that the workers get sick. That there's mesothelioma. And so it doesn't matter what you call it."

Addressing the "cleavage fragment argument" in closing remarks to the jury, plaintiffs' counsel contended there were different definitions of asbestos for commercial and health purposes, and that minerals with the same chemistry and dimensions cause the same diseases. The trial court instructed the jury that, before considering whether plaintiffs had proven their failure-to-warn and design-defect claims, it must first determine whether Mr. Lanzo had been exposed to asbestos from JBP or SS. Based on Webber's and Moline's improper testimony, the jury could have reached the conclusion that there was more than

48

one definition for asbestos, and that a public health definition included non-asbestiform tremolite, actinolite, and anthophyllite.

Therefore, we conclude that the trial court's admission of Webber's and Moline's opinions that non-asbestiform amphiboles could cause mesothelioma was clearly capable of producing an unjust result in light of Longo's and Sanchez's testimony and plaintiffs' counsel's repeated arguments echoing their unsupported views. If the jury accepted the experts' unverified opinions, it could certainly believe that it did not matter, in terms of the ability to cause disease, whether Longo correctly identified the structures he found in the vintage samples as bundles or whether those structures were asbestiform or non-asbestiform.

Furthermore, some of the historical testing that Webber had identified did not differentiate between asbestiform and non-asbestiform minerals, and the jury could have concluded that the distinction was irrelevant. Most concerning is the potential impact of Webber's and Moline's testimony since Sanchez had admitted there were non-asbestiform amphiboles in some of the talc used in JBP.

Plaintiffs argue that Webber's and Moline's opinions could not have affected the verdict because the main question asked of the jury on the verdict sheet was whether plaintiffs had proven that Mr. Lanzo was exposed to asbestos

from JBP and/or SS and whether that exposure was a substantial factor in causing his mesothelioma. We disagree.

Webber testified there were different definitions of asbestos for commercial and public health purposes, and that it did not matter whether one called a particle an asbestiform fiber or a cleavage fragment because if it had the right morphological, mineralogical, and chemical characteristics, it could cause disease. Gordon, who was one of plaintiffs' experts, also suggested that a mineral did not have to grow in an asbestiform habit to be asbestos.

In addition, as noted, plaintiffs argued in their opening and closing statements to the jury that there was more than one definition for asbestos and that the distinction between asbestiform fibers and cleavage fragments with the same chemical composition and dimensions was irrelevant to the ability to cause disease.

Therefore, based on the testimony of Webber and Gordon and plaintiffs' opening and closing remarks, the jury could have concluded that the term "asbestos" in the question on the verdict sheet referred to non-asbestiform as well as asbestiform minerals. We reject plaintiffs' contention that the jury's answer on the verdict sheet shows that even if the trial court erred by admitting Webber's and Moline's testimony, the error was harmless.

In sum, the trial court did not perform its gatekeeping function and erroneously permitted Webber and Moline to testify concerning their untested opinion that non-asbestiform minerals could cause mesothelioma. Moreover, the admission of Webber's and Moline's testimony that cleavage fragments can cause asbestos-disease was "clearly capable of producing an unjust result." R. 2:10-2. Therefore, we reverse the judgment and remand the matter for new trials for both defendants.

IV.

We next consider Imerys' contention that the trial court erred by providing the jury with an adverse inference instruction. Imerys contends the instruction was unjustified and unduly prejudicial. JJCI joins in this argument.

Here, plaintiffs sought the adverse inference instruction as to Imerys as a sanction for spoliation of evidence, arguing Imerys' had concealed historic talc samples and TEM grids during discovery and failed to retain certain talc samples.[11] Among other things, plaintiffs' interrogatories asked Imerys to identify any "talc, and/or products containing talc" that it manufactured and had within its possession, custody, or control. In response, Imerys stated that it was

---

[11] TEM grids are used to analyze samples using TEM.

"unable to locate any samples or exemplars" of the product sold to J&J "during the relevant time period" after a "reasonable and diligent search."

Pier testified, however, that she maintained historic talc samples in an offsite storage facility. She also explained that Imerys maintains all TEM grids, but admitted they were not turned over in litigation. Additionally, plaintiffs produced a 2009 email noting the existence of preserved talc samples from 1967 through 1984. Pier testified she did not look for the samples referenced in the email. At trial, Imerys conceded the discovery violation and the existence of samples dating back to 2001.

Regarding the alleged destruction of the samples, Pier testified that Imerys' corporate predecessor, Luzenac America, Inc. (Luzenac), had a policy to destroy talc samples, but not TEM grids, after two years even during periods of ongoing litigation, and that the policy remained in place. Furthermore, the outside laboratories that Imerys utilized for testing had also destroyed talc samples, and neither Imerys nor Luzenac acted to prevent the laboratories from destroying the samples.

The trial court found there was no evidence of intentional destruction but Imerys had improperly discarded evidence. The court found Imerys "had a legal obligation . . . to keep the samples and . . . grids since [Imerys was] aware of the

52

talc asbestos litigation going back to the late 1970s."  The court noted "this evidence is certainly material" to this and other cases.

Although the court initially decided to suppress Imerys' answer and defenses, it reconsidered that decision and decided to provide the jury with an adverse inference instruction regarding Imerys.  The court told the jury it had:

> determined that the defendant Imerys failed to identify the existence of certain talc samples and TEM grids in its possession.  It was obligated, by the rules governing discovery, to advise the plaintiff of the existence of such talc samples and TEM grids so an expert on behalf of plaintiff could have reviewed same, issued an opinion[,] and provided testimony for the jury's consideration.
>
> The court has also found, based on the evidence in this case, that talc samples and TEM grids in the control of defendant Imerys were wrongfully withheld and as to some samples, destroyed or discarded.
>
> You may infer that the missing evidence may have been helpful to the plaintiffs' case to the detriment of defendant Imerys.
>
> As jurors, you may accept or reject the inference, but I caution you that any inference you may draw as to this specific charge would be as to defendant Imerys only and no other defendant in this case.
>
> I charge you specifically that [JJCI] was not involved in the conduct just described.

A-5711-17

On appeal, Imerys does not challenge the court's finding that it failed to provide discovery and that it discarded certain talc samples. Imerys argues, however, it had no duty to preserve the talc samples it discarded, the alleged spoliation was neither intentional nor reckless, plaintiffs suffered no harm, and the adverse inference instruction was overbroad and misleading.

The purpose of an adverse inference instruction is to level "the playing field where evidence has been hidden or destroyed." Rosenblit v. Zimmerman, 166 N.J. 391, 401 (2001). When crafting remedies for spoliation, the trial courts should ensure "the consequence of the lost evidence falls on the spoliator rather than on an innocent party." Robertet Flavors, Inc. v. Tri-Form Const., Inc., 203 N.J. 252, 284 (2010). "'[A]n adverse inference instruction is a powerful tool in a jury trial' that 'when not warranted, creates a substantial danger of unfair prejudice.'" Washington v. Perez, 219 N.J. 338, 357 (2014) (quoting Morris v. Union Pac. R.R., 373 F.3d 896, 900, 903 (8th Cir. 2004)).

Spoliation refers to "the hiding or destroying of litigation evidence, generally by an adverse party." Rosenblit, 166 N.J. at 401. The duty to preserve evidence "arises where there is: (1) pending or probable litigation involving the [opposing party]; (2) knowledge by the [spoliator] of the existence or likelihood of litigation; (3) foreseeability of harm to the [opposing party], or in other words,

discarding the evidence would be prejudicial to [the opposing party]; and (4) evidence relevant to the litigation." Aetna Life & Cas. Co. v. Imet Mason Contractors, 309 N.J. Super. 358, 366 (App. Div. 1998) (quoting Hirsch v. Gen. Motors Corp., 266 N.J. Super. 222, 250 (Law Div. 1993)); see also State v. Cullen, 424 N.J. Super. 566, 587 (App. Div. 2012). "[T]he duty to preserve evidence is not boundless." Hirsch, 266 N.J. Super. at 251. "A potential spoliator need do only what is reasonable under the circumstances." Ibid. (citation omitted).

At the outset, we note Imerys' argument primarily is focused upon the destruction of the talc samples. The trial court's decision to provide an adverse inference instruction also was based on the discovery violation.

A. Duty to Preserve Talc Samples.

Imerys argues that it owed no duty to plaintiffs to preserve talc samples or modify its standard procedure to discard samples after two years of retention. Imerys contends the duty to preserve evidence only arises when a potential defendant is aware of likely or probable litigation by a particular plaintiff asserting the claim at issue in that case. We disagree.

"[T]he existence of a duty to preserve evidence is a question of law to be determined by the trial court." Gilleski v. Cmty. Med. Ctr., 336 N.J. Super. 646,

653 (App. Div. 2001).  Therefore, our review is de novo.  <u>Manalapan Realty, LP v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995).

Here, the trial court found Imerys was aware of lawsuits regarding exposure to asbestos and therefore Imerys and its corporate predecessor had a duty retain test samples for use in pending and future litigation.  The court initially noted that, "at a minimum," Imerys was on notice of the need to preserve samples for litigation in 2009, as of the date of the email acknowledging the existence of preserved talc samples.

The court also noted that, based on Downey's testimony, Imerys was aware of talc-related asbestos litigation as early as 1979, and Cyprus took steps to avoid potential liability from that lawsuit.[12]  The court pointed out that when Cyprus purchased the Vermont mines from J&J in 1989 and entered into an exclusive agreement to supply talc to J&J, it negotiated an indemnification clause that included claims of asbestosis arising from talc exposure.  The court

---

[12]  Downey testified that in <u>Westfall v. Whittaker, Clark & Daniels</u>, 571 F. Supp. 304 (D.R.I. 1983), a case filed in 1979, the plaintiff claimed he contracted mesothelioma from inhaling asbestos-contaminated talc while working.  Downey noted that Metropolitan Talc Company (MTC) was a defendant in that action. Downey explained that when Cyprus purchased MTC, it decided to acquire the company's assets, rather than its stock, to limit its potential liability.

also noted that in 1992, when Cyprus sold its talc business, it agreed to retain liability for litigation that arose from the business.

Thus, the record shows that Imerys knew or should have known it was probable that individuals, like Mr. Lanzo, would bring claims and allege they suffer from asbestos-related illnesses caused by their use of J&J products made with talc. Since tests of talc samples for the presence of asbestos could be critical in such lawsuits, it was foreseeable that litigants pursuing these claims would be prejudiced by the destruction of this evidence. The test samples were clearly relevant to any such lawsuit.

The decision in Williams v. BASF Catalysts LLC, 765 F.3d 306 (3d Cir. 2014), supports our conclusion. In that case, the plaintiffs alleged BASF Catalysts, a talc mine operator and manufacturer of talc products, and its attorneys destroyed or concealed test results documenting the presence of asbestos in its products. Id. at 310-11. The plaintiffs claimed they were harmed by the defendants' conduct because it caused them to settle lawsuits or dismiss claims they otherwise would have pursued. Id. at 311. The federal district court dismissed these claims. Ibid.

The Court of Appeals reversed and held that a plaintiff may recover in an independent fraudulent concealment action for harm caused in a prior

proceeding by the opposing party's spoliation of evidence. Id. at 320 (citing Rosenblit, 166 N.J. at 407). The court noted that the first element of a fraudulent concealment claim is that "the defendant had a legal obligation to disclose evidence in connection with an existing or pending litigation." Id. at 320 (quoting Rosenblit, 166 N.J. at 406). The court remanded the case to the district court, holding that the defendants were "duty-bound" to disclose evidence from as early as 1979, when BASF "faced actual or threatened litigation over asbestos injuries caused by its products." Id. at 321.

Similarly, in Livingston v. Isuzu Motors, Ltd., 910 F. Supp. 1473, 1478 (D. Mont. 1995), the plaintiff was injured when her vehicle rolled over and this led to products-liability litigation regarding the potential of the vehicle at issue to roll over. The defendants argued the trial court erred by admitting evidence that they "destroyed raw test data" regarding the vehicle's safety tests. Id. at 1494. They claimed the practice of destroying such data was not bad faith, and therefore, the plaintiffs could not use evidence of the destruction to show that the defendants intended to dispose of unfavorable information. Ibid.

The court rejected the defendants' argument, observing that, "without the raw data, it [was] nearly impossible to verify the accuracy" of Isuzu's summary safety reports. Ibid. It held that, because the defendants had general knowledge

of the rollover problem, they "had notice of potential relevance to this and other litigation involving their product." Ibid. Because the evidence of destruction of raw data was relevant to the litigation, evidence of its destruction was properly admitted. Ibid.

The reasoning in Williams and Livingston is persuasive and consistent with the principles enunciated in Aetna and Hirsch. We reject Imerys' contention that the duty to preserve evidence only arises when a defendant is aware of probable litigation involving a particular plaintiff.

Here, the record shows Imerys had sufficient knowledge that individuals like Mr. Lanzo probably would pursue litigation and claim they suffer from asbestos-related disease based on their exposure to products that contain talc supplied by Imerys or its corporate predecessors. Under the circumstances, Imerys had a duty to preserve evidence that was relevant to such claims. See also Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 471-72 (App. Div. 2012) (noting that "duty to preserve evidence 'arises when there is pending or likely litigation between two parties'" (quoting Cockerline v. Menendez, 411 N.J. Super. 596, 620 (App. Div. 2010))).

In support of its contention that it did not have a duty to preserve the discarded talc samples, Imery relies upon our opinions in Aetna, 309 N.J. Super.

at 366; Hirsch, 266 N.J. Super. at 251, and Cockerline, 411 N.J. Super. at 620. Imerys' reliance upon these opinions is misplaced.

Aetna dealt with an insurer's obligation to preserve a vehicle that caught fire which spread to several condominium units under construction. 309 N.J. Super. at 361. The vehicle was destroyed after Aetna's expert inspected it and produced a report indicating the fire may have been caused by a fuel-line problem or a defect in the carburetor. Id. at 362-63. We held Aetna had a duty to preserve the vehicle because there was a likelihood of subsequent litigation, and disposal of the vehicle would be prejudicial to the defendants. Id. at 367.

In Hirsch, the plaintiffs' vehicle had been damaged in a fire. 266 N.J. Super. at 228. State Farm, the plaintiffs' insurer, declared the vehicle a total loss and paid the plaintiffs' claim. Id. at 230-31. State Farm then had the vehicle inspected and a report was prepared, which stated that the fire had been caused by a ruptured brake fluid line. Id. at 231.

The report eliminated other possible causes for the fire. Ibid. The vehicle was sold. Ibid. State Farm then filed a claim on behalf of the plaintiffs against the manufacturer and dealer alleging, among other things, that the vehicle was defective. Id. at 232. We held the plaintiffs had a duty to preserve the vehicle

since the inspection report placed the plaintiffs on notice of possible litigation concerning the vehicle.  Id. at 244, 251.

Cockerline arose from a multi-vehicle accident in which an individual was killed.  411 N.J. Super. at 605-06.  The appellants' vehicle was equipped with an information system that recorded its speed and brake applications.  Id. at 610.  The appellants' protocol called for retention of that information on a computer for thirty days unless the vehicle was involved in a serious accident, in which case the information was to be printed out and retained.  Ibid.

The vehicle involved in the accident was repaired and the data purged after thirty days.  Ibid.  We held the trial court did not err by providing the jury with an adverse inference instruction based on the spoliation of evidence, noting that there was a duty to retain the data when there is pending or likely litigation between the two parties.  Id. at 620, 622 (citing Aetna, 309 N.J. Super. at 366; Hirsch, 266 N.J. Super. at 250-51).

As indicated, Aetna, Hirsch, and Cockerline each address a party's duty to retain evidence that may pertain to future litigation.  The decision of whether litigation between the parties is probable or likely depends on the facts and circumstances of a particular matter.  Aetna, Hirsh, and Cockerline are factually

distinguishable and do not support the conclusion that Imerys did not have a duty to preserve the talc samples in this particular case.

Here, the record supports the trial court's conclusion that Imerys had sufficient notice that a plaintiff, like Mr. Lanzo, would likely bring an action claiming that he suffers from asbestos-related disease caused by a product made with Imerys' talc and that it had a duty to preserve evidence relevant to such a claim. Aetna, Hirsch, and Cockerline do not require a different conclusion.

 B. Level of Intent Required for Adverse Inference Instruction.

Imerys further argues that the trial court erred by issuing an adverse inference instruction. Imerys contends the inference was not warranted in this case. Again, we disagree.

The most common civil remedy for spoliation is the "spoliation inference," which "comes into play where a litigant is made aware of the destruction or concealment of evidence during the underlying litigation." Rosenblit, 166 N.J. at 401. The inference allows a jury "to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her," and is intended as "a method of evening the playing field where evidence has been hidden or destroyed." Id. at 401-02. Whether to charge the jury or impose some other sanction for spoliation is a matter "left to

62

the trial court's discretion and will not be disturbed if it is just and reasonable in the circumstances." Bldg. Materials Corp. of Am., 424 N.J. Super. at 472 (quoting Cockerline, 411 N.J. Super. at 620-21).

In Robertet, the Court stated that when deciding the appropriate sanction for spoliation, a trial court should consider the identity of the spoliator, when the spoliation was discovered, and the essential purposes of the sanction, which are "to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; to punish the wrongdoer; and to deter others from such conduct." 203 N.J. at 272-73 (quoting Rosenblit, 166 N.J. at 401). The trial court also should consider, "the spoliator's degree of fault, the prejudice caused to the other party, and the availability of lesser sanctions that will both avoid unfairness to the non-spoliator and deter future acts of spoliation." Id. at 278 (citing Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994)).

In this case, the trial judge considered the relevant factors and made the following findings. The judge found that Imerys and its corporate predecessors were aware that its talc samples and TEM grids would be relevant in future litigation involving claims that products with Imerys talc caused asbestos-related disease.

The judge stated that the talc samples and TEM grids were "certainly material" to such litigation. The judge noted that during the trial, defense counsel had criticized plaintiffs for having had Longo analyze samples purchased on eBay, even though Imerys had concealed the existence of other samples in discovery.

The judge further found that plaintiffs were aware JJCI had retained samples of the talc prior to the trial because in its answers to interrogatories, JJCI had acknowledged as much. The judge observed that plaintiffs had the opportunity to compel production of JJCI's samples, but Imerys' samples "would not have been the same" as those retained by JJCI. Moreover, only Imerys and its predecessors had control of their samples, the TEM grids, and the samples tested by outside laboratories.

In addition, the judge found that while Imerys had not intentionally withheld, altered, or destroyed the evidence with the purpose to disrupt the litigation, plaintiffs were prejudiced because they had to "rely on an evidential record that did not contain evidence" that Imerys had concealed. The judge found that the talc samples that were concealed or discarded were "crucial" to plaintiffs' case.

A-5711-17

On appeal, Imerys argues that the adverse inference instruction was not warranted because the trial court found that the discovery violation was not intentional, and the court never found that Imerys or its corporate predecessors acted recklessly when they destroyed the talc samples. In support of its contention, Imerys relies upon Jerista v. Murray, 185 N.J. 175 (2005).

In Jerista, the Court stated: "If plaintiffs can make a threshold showing that defendant's recklessness caused the loss or destruction of relevant evidence in the underlying personal injury lawsuit, the jury should be instructed that it may infer that the missing evidence would have been helpful to plaintiffs' case and inured to defendant's detriment." Id. at 203. However, the Court did not require a finding of recklessness in all cases where an adverse inference is sought.

Furthermore, "[t]he spoliator's level of intent, whether negligent or intentional, does not affect the spoliator's liability," and the spoliator's "state of mind is not essential to determine the proper sanction to be imposed" because the focus is on erasing the prejudice suffered by the opposing party. Aetna, 309 N.J. Super. at 368 (quoting Hirsch, 266 N.J. Super. at 256, 265). The spoliator's intent is only one "factor to be considered when determining the appropriate remedy." Ibid. (quoting Hirsch, 266 N.J. Super. at 256); see also Bldg. Materials

Corp. of Am., 424 N.J. Super. at 472-73 (holding that "[w]hen the duty to preserve evidence is violated, the party is responsible regardless of whether the spoliation occurred because of intentional or negligent conduct."). Therefore, Imerys' reliance on Jerista is misplaced.

C. Harm to the Plaintiffs.

Imerys also argues that the instruction was not warranted because plaintiffs suffered no harm from the spoliation. Imerys notes that plaintiffs did not request JJCI's historic talc samples for testing. However, as the trial court noted, the Imerys samples and TEM grids that Imerys destroyed or concealed were not the same as samples and tests of JJCI's products.

The trial court also found the TEM grids were highly relevant to the litigation, as were the samples that outside laboratories tested for Luzenac and Imerys. Thus, there was sufficient evidence in the record to support the trial court's finding that plaintiffs were prejudiced by Imerys' concealment and destruction of evidence.

D. Prejudice.

Imerys further argues charge was "deeply prejudicial" because it "allowed the jury to resolve one of the core issues in the case against Imerys without evidence." Imerys claims the instruction was "especially harmful" at the

punitive damages phase of trial because it made it "far too easy" for the jury to conclude it acted maliciously. These arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We therefore conclude the trial court did not err by providing the jury with an adverse inference instruction as a sanction for Imerys' discovery violation and its destruction of evidence. Imerys had a duty to disclose the evidence sought in discovery. It also had a duty to preserve the talc samples and TEM grids that it discarded.

Imerys further argues that, if the adverse inference instruction was warranted, the instruction provided was improper because it allowed the jury to assume it discarded or destroyed evidence during the discovery phase of the case. The argument lacks sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E). We note, however, that although the instruction could have been more precise, it was not misleading.

V.

JJCI argues the trial court erred by denying its severance motion following its decision to give the adverse inference charge to the jury as a remedy for Imerys' spoliation of evidence. JJCI asserts it "was unreasonable for the court to tell the jury it could infer that talc supplied to [JJCI] was contaminated, but

then expect that the jury would not reach the same conclusion with respect to that very same talc that [JJCI] bottled and sold."

Rule 4:29-2 provides a court "may order separate trials . . . to prevent delay or prejudice." In addition, Rule 4:38-2(a) states that a court is empowered to order a separate trial of any claim "for the convenience of the parties or to avoid prejudice." A trial court may order separate liability or damages trials against different defendants to avoid prejudice or jury confusion. Barbaria v. Twp. of Sayreville, 191 N.J. Super. 395, 404 (App. Div. 1983); Eschle v. E. Freight Ways, Inc., 128 N.J. Super. 299, 306-07 (Law Div. 1974).

In deciding a severance motion, a court must "balance[] the . . . interest in judicial economy against the potential prejudice to a defendant." State v. Mance, 300 N.J. Super. 37, 53 (App. Div. 1997). Prejudice "cannot easily be quantified, particularly if separate trials would not materially alter the evidence offered to support and defeat the claims." Rendine v. Pantzer, 141 N.J. 292, 310 (1995).

However, severance may be appropriate "where a significant portion of the evidence to be adduced at trial is admissible only as to one defendant thereby causing prejudice to other defendants." Mance, 300 N.J. Super. at 53. We will not reverse a trial court's decision on a severance motion unless it is shown to be a mistaken exercise of discretion. Rendine, 141 N.J. at 311.

It is undisputed that JJCI did not conceal or destroy any evidence relevant to plaintiffs' claims. Consequently, the trial court endeavored to fashion an instruction that would allow the jury to "infer that the missing evidence may have been helpful to the plaintiffs' case to the detriment of defendant Imerys." However, while the charge may have allowed the jury to draw an inference that leveled the playing field with regard to plaintiffs' claims against Imerys, the instruction was unduly prejudicial to JJCI.

The evidence presented at trial revealed that talc comprised more than ninety-nine percent of JBP, and JJCI sold baby powder made from talc that Imerys or its predecessor companies supplied. The adverse inference instruction allowed the jury to infer the talc that Imerys supplied was contaminated with asbestos. If that were the case, the jury could conclude that JJCI's talc products were similarly contaminated.

As stated previously the trial judge instructed the jury that any adverse inference it chose to draw "would be as to defendant Imerys only and no other defendant in this case," and JJCI "was not involved in the conduct just described." We recognize that jurors are presumed to follow the court's instructions. Cohen v. Cmty. Med. Ctr., 386 N.J. Super. 387, 399 (App. Div. 2006).

69

We are convinced, however, that once the jury was permitted to draw an adverse inference that Imerys' talc was contaminated with asbestos, it would be difficult, if not impossible, for the jury not to make the same finding as to JJCI. We therefore conclude that the trial court erred by failing to sever the claims against JJCI and Imerys.

In view of our decision, we need not address the other issues that JJCI and Imerys have raised on appeal, including the contentions that: the trial court erred by allowing Longo to testify concerning the tests of the vintage JBP samples; the jury instructions improperly constrained consideration of alternative causes of Mr. Lanzo's illness; and there was insufficient evidence to support the jury's verdicts.

Reversed and remanded to the trial court for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5711-17